**Dr. Marjorie Reiley MAGUIRE, Plaintiff,**

v.

**MARQUETTE UNIVERSITY, Defendant.**

Civ. A. No. 84–C–711.

United States District Court, E.D. Wisconsin,

Feb. 12, 1986.

Walter F. Kelly, Milwaukee, Wis., for plaintiff.

John G. Hill, Jr., Gen. Counsel, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This case presents a very interesting question and that is whether or not federal judges should decide who is eligible to teach in the theology department of a religious university—in this case, Marquette, which is run by the Jesuits of the Roman Catholic Church. The Court is troubled by the fact that both parties seem to agree that this Court should have something to say about plaintiff's eligibility to teach in Marquette's theology department.

Setting aside the question of the competence of this Court to decide who is and who is not a good Catholic, I think for the reasons stated in this decision that Title VII and the First Amendment to the United States Constitution, which provides for the separation of church and state, preclude this Court from assuming jurisdiction of the subject matter of this action.

Plaintiff alleges that Marquette University refused to hire her as an associate professor of theology because she is a woman and because of certain of Marquette's agents' "perceptions and/or misperceptions ... concerning the plaintiff's views repecting the moral theology of abortion and/or the public policy of abortion ...." (plaintiff's supplemental complaint, par. XIV–A, filed July 25, 1985). Jurisdiction allegedly arises under 28 U.S.C. §§ 1331 and 1343 for her Title VII sex discrimination claim. The court has pendent jurisdiction over her state law claim that she was denied the academic freedom that Wisconsin law protects. The facts are taken from the parties' submissions.

Plaintiff brought this action in May of 1984. She successfully sought the recusal of two federal judges, and the case was then assigned to me in May of 1985. There are currently two motions before the Court. The plaintiff seeks leave to supplement her complaint and the defendant has moved for partial summary judgment. The defendant does not oppose the motion to supplement the complaint and that motion will be granted.

In its motion for partial summary judgment, the University seeks a court ruling that its policy of reserving half the teaching positions in the theology department for Jesuits is exempt from Title VII attack, that all of plaintiff's allegations of discrimination arising before April 7, 1980, are untimely, and that plaintiff's claims to academic freedom be dismissed because she was never a member of the school's faculty.

The defendant appears willing to go to trial on the question of whether it discriminated against the defendant in regard to that half of the theology department positions that are not reserved for Jesuits. Although it is apparent to the Court that summary judgment is also appropriate on that question, the defendant has failed to request it.

The principle question before the Court was barely alluded to in the defendant's moving papers and would remain even if Marquette is successful on its motion for summary judgment. It is whether a federal court is the appropriate forum in which to decide who should teach in the theology department at a Catholic University. Because I find that it is not, the defendant's

motion for partial summary judgment will be construed as a motion for summary judgment and be granted. The Court's basis for decision renders the other issues the defendant has raised moot.

### FACTS

Marquette University takes its name from Pere Jacques Marquette, a Jesuit missionary who explored New France, Wisconsin, and the Mississippi river in the 17th Century. The University was formally opened in Milwaukee, Wisconsin, in 1881 under the auspices of the Society of Jesus, the Jesuits. Marquette University currently consists of thirteen colleges, schools and programs, and offers both graduate and undergraduate degrees to the roughly ten thousand students enrolled at its sixty-eight acre campus. Undergraduate students in business administration, education, engineering, journalism, liberal arts, medical technology, nursing, physical therapy, and speech complete courses for credit in theology.

Marquette informs the Court that its basic goals and principles are as follows:

Marquette's primary reason for being is a shared conviction on the part of its sponsors and sustainers that their Catholic belief has dimensions pertinent to and salutary for higher education, and that those dimensions can best be celebrated in distinctly Catholic institutions. In other words, a Catholic university is one of the inumerable witnesses Catholics may give of their faith. It surely is that a part of Catholic belief is the necessity of conforming life to faith, i.e., to be integral. For some the life to be made whole is the life of higher education, and Catholic universities are an expression of this drive to integrity.

("*University and Catholic: Final Report of the Special Committee on the Christian Character of Marquette University,*" at 1, dated July 1, 1977. The report is an abbreviated version of a 1969 report entitled: "*University and Catholic*").

Article I of the Amended By-Laws of Marquette University provides, in relevant part, that "The University shall be governed as an independent private corporate entity of the State of Wisconsin, conducted under the auspices, and consonant with the educational principles, of the Society of Jesus." Article II, Section 1 of those by-laws sets up a governing board of twenty-nine trustees, eight of whom are to be Jesuits. Three-fourths of the trustees must vote affirmatively to elect a trustee or to change the by-laws. This gives the Jesuit trustees, if they vote as a block, the power to deny the other trustees the authority to make such changes without Jesuit approval.

Marquette University contracts with the Marquette Jesuit Associates, Inc. The Associate's headquarters serves as the residence for the seventy Jesuits who work for Marquette University. This organization receives the salaries of its members, uses the money to defray the members' expenses, and returns the surplus to the University for its unrestricted use. In fiscal year 1983–84 the associates returned $250,-000. Each year the group is one of the largest financial contributors to the University. In his affidavit in support of Marquette's motion, the Executive Vice President of the University states that although they welcome the financial support, "Even more cherished ... is the moral and intellectual contribution which these Jesuits make to the purpose and mission of the University." Affidavit of Quentin L. Quade at 4, September 24, 1984.

The University has adopted an affirmative action plan, which plan includes a clause in which the University reserves the right to "grant preferences in its employment practices to Jesuits to perform any work connected with the carrying on by Marquette University of its activities." Marquette University Affirmative Action Program, Article II(c), November 1980. In the instant action the plaintiff questions the validity of this preference as it is applied to the hiring of Jesuits in the theology department.

The plaintiff is a white woman who has unsuccessfully applied for a position as an associate professor of theology specializing in the area of systematics. The head of the

Marquette theology department informs the court that systematics has been defined as "the total theological enterprise as this has been unified by the architectonic reason ... it seeks to articulate all the constituent elements of Theology in a coherent whole ..." Affidavit of Rev. William Kelly, September 24, 1984, quoting from John Macquarrie, *Principles of Christian Theology*, at 39 (1977). The plaintiff seeks damages for wages and benefits she would have received had she been hired. She also asks this Court to order the University to hire her for that position.

Approximately half of the current members of the theology department are Jesuits who are, by definition, male. Only one of the 27 full-time positions is held by a woman. That figure is apparently lower than numbers found in the theology departments of comparable institutions. Plaintiff has provided the Court with deposition testimony that female candidates are asked different questions than male candidates and that department members have on occasion made sexist comments.

The Jesuits are particularly influential in the theology department. In fact, they run it. At the time plaintiff was applying, the advisory/hiring committee was appointed by the head of the theology department, a Jesuit, who was himself appointed by the Jesuit Dean without an election by the faculty. The Jesuit chairman of the theology department would then appoint two other Jesuits and one non-Jesuit to the advisory/hiring committee. Jesuits take a vow to obey their superiors, and department chairmen and deans are considered to be superiors in the departments that they oversee.

Plaintiff applied for positions on at least six occasions over several years, and she questions whether her earlier applications were even considered. She claims that although she is a Catholic and qualified to fill the position, the University has refused to hire her because she is a woman and because of the beliefs of certain of the defendant's agents respecting plaintiff's views on the moral theology of abortion.

In its motion for partial summary judgment, the University seeks a ruling that it may give preference to Jesuits in making its hiring decisions, but, as indicated before, Marquette is apparently planning to go to trial on the question of whether the plaintiff was discriminated against with regard to hiring for the roughly fifty-percent of theology positions that are not reserved for Jesuits. Defendant's briefs and plaintiff's supplemental complaint reveal that an issue at trial would be whether the plaintiff's views on abortion are consonant with the defendant's understanding of the teachings of the Catholic church. It is not clear if this was the reason why the defendant was not hired, but the answer to the supplemental complaint indicates that that is the reason. The answer is as follows:

4. Even if the cognizant agent of Marquette University were to find the plaintiff's academic record competitive, her application for employment would have been rejected because of her perceived hostility to the institutional church and its teachings, and to the goals and mission of Marquette University.

Defendant's answer to supplemental complaint at 2, ¶ 4 (August 2, 1985).

## LEGAL ANALYSIS

■ The entry level question for the court is whether it has jurisdiction to judge the hiring practices in the theology department of a Catholic university. The First Amendment to the United States Constitution prohibits Congress from making any "law respecting establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. amend. I. The plaintiff argues that Title VII's prohibition on sex discrimination gives the court jurisdiction over hiring decisions made by Marquette's theology department. That is not so.

Among other defenses, the defendant claims that it is exempt from plaintiff's Title VII claim because of 42 U.S.C. § 2000e–2(e)(2) which provides an exception for educational institutions controlled by religious groups:

*... [I]t shall not be unlawful employment practice for a school,* college, university, or other educational institution or institution of learning *to hire and employ employees of a particular religion if such school,* college, university, or other educational institution or institution of learning *is,* in whole or *in substantial part,* owned, supported, *controlled, or managed by a particular religion* or by a particular religious corporation, association, or *society. . . .*
(emphasis added)

Marquette has established that it is "in substantial part, controlled, or managed" by the Jesuits as that phrase is used in 42 U.S.C. § 2000e–2(e)(2). *Tagatz v. Marquette,* No. 82–C–812, slip op. at 8, (E.D. Wis. July 16, 1985). Nothing the plaintiff has submitted in opposition to the defendant's motion would cause it to question that conclusion. The Jesuit's influence and control is especially apparent in the school's theology department.

The plaintiff argues, however, that even if the Court finds that the Jesuits control or manage the University, the exemption is not available to the defendant because plaintiff is a Catholic. Defendant, by asserting the exemption and through its defenses, has revealed that it is not in agreement with plaintiff on this question. Assuming the court was willing to delve into the hiring decisions relating to the theology department at Marquette, one question at trial would be whether in failing to hire the plaintiff as an associate professor of theology the defendant did so because it chose to "employ employees of a particular religion"; i.e., whether or not the plaintiff is or is not a Catholic.

Such an inquiry would require the Court to immerse itself not only in the procedures and hiring practices of the theology department of a Catholic University but, further, into definitions of what it is to be a Catholic. That question is one the First Amendment leaves to theology departments and church officials, not federal judges.

If the Court were to grant plaintiff the relief she requests, a place on Marquette's theology faculty, the government would, in effect, be forcing its interpretation of what Catholicism demands on the University and its students. Such a ruling would not only interfere with the theology department's right to freely exercise its religion through the explication and analysis of Catholicism and other religions, but would also result in a governmental imprimatur of approval on a particular set of beliefs as "Catholic." The Court can no more rule that the plaintiff is not a Catholic than it could find that members of the hiring committee are Catholic.

The plaintiff stresses that Marquette University is a university and not a seminary, and argues that there is no free exercise right to discriminate on the basis of sex. There is no question but that the government has a significant interest in eradicating sex discrimination. But as Title VII and the First Amendment recognize, the right to exercise religious faith free of governmental interference is fundamental.

Plaintiff seeks employment as a theology professor at a Catholic school, and her own pleadings reveal that one of the reasons she was not hired is that defendant felt her beliefs made her an inappropriate applicant to fill the position. She terms the Marquette agent's beliefs as "perceptions and/or misperceptions," but in the end the result is the same. The hiring committee of a Catholic University decided not to hire plaintiff to teach in its theology department. The allegation of misperception does not make this a special case.

Plaintiff's complaint of sex discrimination does not assert against Marquette a fundamental right against which the fundamental religious rights of Marquette's Jesuit decision-makers must be balanced. Plaintiff is not the United States Government seeking to revoke the tax exempt status of a University that forbids interracial dating or marriage. *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1984). This is not the case of a fraternal organization asserting its right to free speech and association as a means to justify the blanket

**1504**

exclusion of women members. *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Nor is the sensitive position of a theology professor similar to that of the editorial-secretary in *E.E.O.C. v. Pacific Press Pub Ass'n*, 676 F.2d 1272 (9th Cir.1982), who was fired for filing a discrimination action against a church-related publishing house, even though that was contrary to a church prohibition of suits against it by its members. Neither is the job of theology professor similar to a position on the support staff of a seminary. *E.E.O.C. v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982).

There is probably no teaching position at Marquette University which is more closely tied to the University's religious character than that of theology professor. Plaintiff has not applied for a position in one of the more secular departments, such as the plaintiff in *E.E.O.C. v. Mississippi College*, 626 F.2d 477 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), who sought a full-time position in that school's psychology department. The present suit is more analogous to *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153, (1972), wherein the Fifth Circuit Court of Appeals held that:

the application of the provisions of Title VII to the employment relationship existing between The Salvation Army and Mrs. McClure, a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment.

*McClure* at 560.

The court in *McClure* stressed that:

Only in rare instances where a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate" is shown can a court uphold state action which imposes even an "incidental burden" on the free exercise of religion. In this highly sensitive constitutional area " '[o]nly the gravest abuses, endangering paramount inter-

ests, give occasion for permissible limitation'". *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Restrictions on the free exercise of religion are allowed only when it is necessary "to prevent grave and immediate danger to interests which the state may lawfully protect". *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). "[T]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom". *Cantwell v. Connecticut*, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

*McClure* at 558.

The Fifth Circuit has had at least two occasions to review its *McClure* decision. In *Southwestern Baptist*, 651 F.2d at 277, it held that a seminary's faculty, and those administrators "who equate to or supervise faculty," were exempt from Title VII's reporting requirements. 651 F.2d at 284–5. In the earlier case of *Mississippi College*, 626 F.2d at 477, the court had held that "section 702 of Title VII ... excludes from the application of the Act any employment practices of a religious educational institution that discriminates on the basis of religion regardless of whether the religious discrimination is a pretext for some other type of discrimination." 626 F.2d at 489.

Plaintiff ignores that language and points to another part of the *Mississippi College* opinion where the court explained that "*McClure v. Salvation Army* ... exempts from the coverage of Title VII only the relationship between a church and its minister and does not apply to the relationship between a religious educational institution and its faculty." 626 F.2d at 489. That broad statement is belied by the court's earlier recognition of the right to discriminate for religious reasons, and the court's analysis in that case of why Title VII did not apply to faculty.

The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. *They nei-*

*ther attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine.* That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.

*Mississippi College,* 626 F.2d at 485 (emphasis supplied).

The plaintiff here asks the Court to order a Catholic University to hire her to teach systematic theology, which has been defined for the Court as a discipline that "seeks to articulate all the constituent elements of theology in a coherent whole ..." John Macquarrie, *Principles of Christian Theology,* p. 39 (1977). A professor of systematic theology would necessarily "instruct the students in the whole of religious doctrine." 626 F.2d at 485.

The Court is satisfied that if it were to issue an order that the University theology department hire plaintiff, it would necessarily violate the free exercise clause of the First Amendment and impermissibly entangle government with religion.

As the Fourth Circuit Court of Appeals summed up in *Rayburn v. General Conference of Seventh Day Adventists,* 772 F.2d 1164 (4th Cir.1985):

Each person's right to believe as he wishes and to practice that belief according to the dictates of his conscience so long as he does not violate the personal rights of others, is fundamental to our system. .... This basic freedom is guaranteed not only to individuals but also to churches in their collective capacities, which must have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." .... Ecclesiastical decisions are generally inviolate; "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," .... The right to choose ministers without government re-

striction underlies the wellbeing of religious community ... *for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines, both to its own membership and to the world at large.*

*Rayburn,* 772 F.2d at 1167–68 (citations and a footnote omitted, emphasis supplied).

For this Court to involve itself in the hiring process of a Catholic theology department, and to make the determination whether the school chose to "employ employees of a particular religion," 42 U.S.C. § 2000e–2(a), would also violate the third prong of the test for "establishment" set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), that statutes not foster "an excessive government entanglement with religion." 403 U.S. at 613, 91 S.Ct. at 2111.

Entanglement here differs from the typical establishment case in that a court ruling on the question would not directly impact upon nonbelievers and believers of different faiths, but would only affect Catholics. The state, through this court, would involve itself in theological questions and then, if finding for plaintiff, impose upon the theology department at Marquette the Court's judgment as to what comprises adherence to the Catholic faith. Apart from the impact upon the free exercise of religion at Marquette, such a decision would violate the prohibition that the state not establish a religion, which would be the effect of a court ruling that plaintiff is a Catholic and that Marquette may not rely on its determination that she is not as a defense in her suit for failure to hire.

The Supreme Court has in the past recognized the dangers of entanglement which arise from court determinations of adherence to church doctrine and belief. *Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Although recognizing that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded....," 393 U.S. at 449,

89 S.Ct. at 606, the court held that civil courts cannot constitutionally make a determination whether a "substantial departure" from significant church doctrine has occurred.

> If the court should determine that a substantial departure has occurred, it must then go on to determine whether the issue on which the general church has departed holds a place of such importance in the traditional theology as to require that the trust be terminated. A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role. ....

*Hull Church*, 393 U.S. at 450, 89 S.Ct. at 606.

The Fourth Circuit Court of Appeals recently detailed the dangers of governmental entanglement in the context of a Title VII action brought by a white woman who was turned down for pastoral positions in the Seventh-Day Adventists Church. *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169–71 (4th Cir.1985). The potential problems of entanglement outlined there are also present here.

The Court is aware that there are substantial differences between the role of a minister and that of a theology professor teaching students at a University. But the similarities between the two go to the very core of what religion is. Even if a theology professor avoids the temptation to proselytize, the subject matter of any course in theology is unavoidably intertwined with questions of faith and church doctrine. This is true whether the course focuses on Catholicism, or an analysis of Buddhism from a Catholic perspective. Every teachers' methods and message are necessarily shaped by their own individual views. In addition, the reason that Marquette has chosen to establish itself as a Catholic University is necessarily most deeply reflected in its theology department. Court involvement in the hiring decisions of that department would necessarily entangle the court with questions of religious doctrine and the procedure by which a Catholic university chooses its theology faculty.

Finding that constitutional questions would be raised by the Court's entry into the hiring decisions of a theology department at a Catholic university, the Court must determine if Title VII can be interpreted in such a way as to avoid the constitutional questions. "[A]n Act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available...." *National Labor Relations Board v. Catholic Bishop of Chicago*, 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979).

■ The language and legislative history of § 702 reveal that Congress intended to allow religious institutions an exemption for employment decisions based upon religious preference. *Rayburn*, 772 F.2d at 1166–67. In 1972 Congress broadened the scope of the exemption, by deleting the word "religious" from a phrase which had limited the permissible discrimination to individuals of a particular religion hired to carry out the employers "religious activities." P.L. 92–261 § 3, 86 Stat. 103 (March 24, 1972). Given this history, it is clear that the exemption applies to hiring decisions made in a theology department at a Catholic university.

■ The second question is whether plaintiff's allegation that she is a Catholic requires the Court to involve itself in ecclesiastical concerns. Because the First Amendment prevents the Court from involving itself in the area, the Court finds that the exception to Title VII created by 42 U.S.C. § 2000e–2(e)(2) should be read to allow the hiring committee of a theology department in a college controlled by a religious society broad latitude when it makes a decision to hire "employees of a particular religion."

■ In the instant action plaintiff's own complaint reveals that the defendant's agents do not believe that her theological beliefs make her an appropriate person to teach in Marquette University's theology department. Despite her protests that she is a Catholic, "of a particular religion," the determination of who fits into that category is for religious authorities and not for the government to decide.

## ACADEMIC FREEDOM

■ Plaintiff also alleges that in failing to hire her, Marquette University acted contrary to Wisconsin law and its own policies regarding academic freedom. The claim fails for two reasons. First, the First Amendment analysis set forth above would prohibit the Court from looking into hiring decisions made by the theology department at Marquette. Second, plaintiff has failed to provide the Court with any authority for the proposition that either the policies of Marquette University, or Wisconsin law, require the principles of academic freedom to be extended to hiring decisions.

## ORDER

IT IS THEREFORE ORDERED that plaintiff Marjorie Maguire's motion to supplement her complaint is granted.

IT IS FURTHER ORDERED that defendant Marquette University's motion for partial summary judgment, construed as a motion for summary judgment, is granted and the action is dismissed.