Dr. Marjorie Reiley MAGUIRE,
Plaintiff-Appellant,

v.

MARQUETTE UNIVERSITY,
Defendant-Appellee.

No. 86–1412.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1986.

Decided March 20, 1987.

Walter F. Kelly, Sutton & Kelly, Milwaukee, Wis., for plaintiff-appellant.

John G. Hill, Jr., Milwaukee, Wis., for defendant-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Between 1976 and 1984 the plaintiff, who holds a Ph.D. in Religious Studies from the Catholic University of America in Washington, D.C., repeatedly applied for and was each time denied a position as an associate professor of theology at Marquette University in Milwaukee, Wisconsin. In 1984 the plaintiff brought suit under Title VII of the Civil Rights Act of 1964 alleging that Marquette had refused to hire her because she is a woman. 42 U.S.C. § 2000e–2(a)(1).

Marquette University was founded in 1881 under the auspices of the Society of Jesus, a religious order affiliated with the Roman Catholic Church. The University takes its name from Pere Jacques Marquette, a Jesuit missionary who explored the Mississippi River in the 17th Century. Marquette is among the largest of the Catholic universities in the United States. It presently consists of thirteen colleges, schools, and programs, and offers both graduate and undergraduate degrees to the roughly ten thousand students enrolled at its sixty-eight acre campus. Theology courses are required for undergraduate students in business administration, education, engineering, journalism, liberal arts, medical technology, nursing, physical therapy and speech.

"Marquette's primary reason for being is a shared conviction on the part of its sponsors and sustainers that their Catholic belief has dimensions pertinent to and salutary for higher education, and that those dimensions can best be celebrated in distinctly Catholic institutions." University and Catholic: Final Report of the Special Committee on the Christian Character of Marquette University 1 (July 1, 1977). Although it is structured as an independent Wisconsin non-profit corporation, Article I of its By-Laws provides that the University shall be "conducted under the auspices, and consonant with the educational principles, of the Society of Jesus." Eight of the twenty-nine member Board of Trustees must be Jesuits, as must the President and the Vice President of the University. A vote of three-fourths of the trustees is required to elect a new trustee or to amend the By-Laws, thus giving the Jesuit trustees the power to block such actions by the Board.

Seventy of the approximately 500 faculty members at Marquette are Jesuits. Marquette Jesuit Associates, Inc. receives the salaries of the Jesuits employed at Marquette, uses the money to defray their living expenses, and then returns the surplus to the University each year for its unrestricted use. Over the past decade the amount returned has averaged around $250,000, making the group one of the largest financial contributors to the University.

Marquette has adopted an affirmative action plan, but the University specifically reserves the right to "grant preferences in its employment practices to Jesuits to perform any work connected with the carrying on by Marquette University of its activities." Marquette University Affirmative Action Program, Article II(c) (November 1980). Nowhere is the effect of the "Jesuit Preference" more deeply felt than in the theology department. Approximately half of the current members of the theology department are Jesuits, who are by definition male. Only one of the 27 full-time positions is held by a woman. The chairman of the theology department is a Jesuit, and the department's advisory/hiring committee is comprised of three Jesuits and one non-Jesuit. The Jesuit perspective permeates the course offerings in theology:

> The courses that are offered here … are taught in the perspective of the Roman Catholic tradition and do emphasize the religious and institutional values of that tradition. The value of ecumenism is stressed, but there is a legitimate presumption that the value system of the Roman Catholic tradition permeates the entire offering in the Department of Theology and all of the students are given an opportunity to deepen their understanding of this tradition as it is perceived and presented by the Society of Jesus.

Affidavit of Rev. William J. Kelly, S.J., Chairman, Department of Theology, Marquette University, at 2 (Sept. 24, 1984).

In addition to alleging general sex discrimination, the plaintiff's original complaint specifically challenged the validity of the "Jesuit Preference" in respect to hiring decisions in the theology department. On May 20, 1985, Marquette filed a motion for partial summary judgment, arguing that its policy of giving preference to Jesuits did not constitute illegal sex discrimination because being a Jesuit was a bona fide occupational qualification for the position of theology professor at a Jesuit university. See 42 U.S.C. § 2000e–2(e)(1); *Pime v. Loyola University*, 803 F.2d 351 (7th Cir.1986). While this motion was pending, the plaintiff filed a motion to supplement her complaint on the basis of information uncovered during the course of discovery. The supplemental complaint added a pendent claim for breach of the Wisconsin law of academic freedom. Paragraph XIV–A stated:

> The plaintiff Dr. Marjorie Reiley Maguire has been denied hiring by the defendant Marquette University, due to the perceptions and/or misperceptions of agents of the defendant Marquette University concerning the plaintiff's views respecting the moral theology of abortion and/or the public policy of abortion in a pluralistic society and the relationship between the two.

Furthermore, in her memorandum opposing Marquette's motion for partial summary judgment, the plaintiff argued:

> The plaintiff's academic freedom cause of action alleges that the defendant's perceived and/or misperceived consideration of the plaintiff's views on the matter of the moral theology of abortion and the public policy of abortion in a pluralistic society and the relationship between the two has substantially motivated it to refuse to hire her into its Theology Department. Defendant does not deny the fact; in view of the record, it could not.

Plaintiff's Memorandum in Response to Defendant's Motion for Partial Summary Judgment at 13 (July 25, 1985).

Marquette filed an answer to the plaintiff's supplemental complaint on August 2, 1985. Marquette contended that the white male appointed to the position which the plaintiff sought had superior qualifications. However, Marquette further maintained, as the plaintiff asserted it would, that

> [e]ven if the cognizant agent of Marquette University were to find the plaintiff's academic record competitive, her application for employment would have been rejected because of her perceived hostility to the institutional church and its teachings, and to the goals and missions of Marquette University.

Answer of Defendant Marquette University to Supplemental Complaint, Special Defense ¶ 4 (Aug. 2, 1985). Moreover, in its

reply memorandum, Marquette called the attention of the district court to Paragraph XIV–A of the supplemental complaint, alleging that "a substantial factor in her denial of employment was the perception of her views on certain issues of Catholic teaching," and argued that on the basis of the admission contained in that paragraph "plaintiff has subjected her entire cause of action to summary dismissal." Defendant's Reply Memorandum at 15 (Aug. 2, 1985).

On February 12, 1986, the district court entered an order dismissing the plaintiff's complaint for what it termed lack of subject matter jurisdiction.[1] 627 F.Supp. 1499 (E.D.Wis.1986). This label, however, inaccurately describes the district court's disposition. The district court clearly had subject matter jurisdiction of the plaintiff's Title VII complaint. 42 U.S.C. § 2000e–5(f). What the district court actually held was that with regard to the plaintiff's claim of sex discrimination, Marquette was exempt from Title VII under the provision which permits a university "to hire and employ employees of a particular religion" if it is "in whole or substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society." 42 U.S.C. § 2000e–2(e)(2). The district court construed the exemption to cover the hiring decisions made in the theology department of a Catholic university and concluded that the First Amendment precluded it from questioning Marquette's determination that the plaintiff's theological beliefs were not only incompatible with but hostile to traditional Catholic doctrine.

The district court conscientiously grappled with the difficult and complex issues concerning the scope of the religious-employer exemption in § 2000e–2(e)(2). See *Pime v. Loyola University*, 803 F.2d 351, 357–358 (7th Cir.1986) (Posner, J., concurring). Fortunately we need not determine whether Marquette qualifies as a religious employer under the terms of the exemption and if so whether the exemption covers the type of hiring decision involved here, for this case can be resolved on a much narrower ground. See, *e.g.*, *Martinez v. United Auto., Aerospace & Agricultural Implement Workers*, 772 F.2d 348, 353 (7th Cir.1985) (court of appeals can affirm on any ground that the record fairly supports and the appellee has not waived). The plaintiff has simply failed to make out a valid claim of sex discrimination under Title VII.

Title VII does not grant relief to individuals who were refused employment "for any reason other than discrimination on account of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–5(g). As we have on numerous occasions held, "the ultimate inquiry in a Title VII disparate treatment claim is whether discriminatory intent was a 'but for' cause of the adverse action." *Germane v. Heckler*, 804 F.2d 366, 368 (7th Cir.1986); see *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1233 n. 4 (7th Cir.1986); *McCluney v. Jos. Schlitz Brewing Co.*, 728 F.2d 924, 928 (7th Cir. 1984); *Sherkow v. Wisconsin*, 630 F.2d 498, 502 (7th Cir.1980). Where the defendant has offered a legitimate, nondiscriminatory reason for rejecting the plaintiff,

[t]he order of proof then would impose upon the plaintiff the burden of proving that the reasons advanced were a pretext and that a motivating or substantial

---

1. The plaintiff also complains about the district court's refusal to defer further consideration of her Title VII claim or to allow the voluntary dismissal of part of her claim so that her parallel Wisconsin Fair Employment Act claim could first be heard by the Wisconsin Equal Rights Division. In denying the plaintiff's motion to defer or dismiss, the court noted that (1) the request came almost two years after she had filed her Title VII suit in federal court; (2) the defendant had already been subjected to two years of extensive and burdensome discovery; (3) the defendant's summary judgment motion had been fully briefed and was pending before the court; and (4) the state hearing would not be determinative of all of the issues in the federal suit. While noting that it was normally inclined to defer to state agencies in matters of unlawful employment practices, the court concluded that "this case is well past the point that any considerations of judicial economy would militate in favor of deferral." *Maguire v. Marquette University*, No. 84–C–711, mem. op. at 1 (E.D.Wis. Feb. 12, 1986). Under these facts, we cannot say that the district court abused its discretion.

factor in the defendant's decision was discrimination and but for that discrimination the plaintiff would have been appointed. *McDonnell-Douglas Corp. v. Green,* [411 U.S. 792] at 804–05, 93 S.Ct. [1817] at 1825 [, 36 L.Ed.2d 668 (1973)]. See also *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274 [97 S.Ct. 568, 50 L.Ed.2d 471 (1977)]. . . .

*Sherkow,* 630 F.2d at 502; see also *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714–716, 103 S.Ct. 1478, 1481–1482, 75 L.Ed.2d 403; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (plaintiff must prove intentional discrimination "by persuading the court that a discriminatory intent more likely [than not] motivated the employer"); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 712 (6th Cir.1985) (even where plaintiff demonstrates that discriminatory intent is a motivating factor in employment decision, employer can still avoid liability under Title VII by proving that the same decision would have been made even in the absence of discrimination).

Marquette's position is that sex had nothing to do with its decision not to hire the plaintiff. It maintains that the plaintiff's credentials were not competitive with those of other applicants, and even if they were, she would have been rejected because of "her perceived hostility to the institutional church and its teachings, and to the goals and missions of Marquette." Far from disputing this latter contention, the plaintiff adopted it as the basis for her pendent state law claim alleging a breach of the Wisconsin law of academic freedom. In fact, in her memorandum opposing Marquette's motion for summary judgment, the plaintiff not only conceded but affirmatively argued that the undisputed record in the case revealed that her views concerning "the moral theology of abortion and the public policy of abortion in a pluralistic society and the relationship between the two ... substantially motivated" Marquette in its refusal to hire her. If this were not enough, the plaintiff herself submitted as exhibits attached to her affidavit in support of her memorandum four letters written by Marquette faculty members to the chairman of the theology department evaluating the plaintiff's application for the position of associate professor of theology and all recommending that she not be hired because of her views on abortion.[2]

---

2. In a letter to Theology Department Chairman William J. Kelly, S.J., dated March 1, 1984, Donald J. Keefe, S.J. wrote:

> Dr. Maguire is a well-known and vociferous exponent of the 'free choice' approach to abortion. This presumed attitude of tolerance is in flat contradiction to the condemnation of abortion as an 'abominable crime' by the Second Vatican Council, a condemnation endorsed by the Catholic magisterium on many occasions before and since. Were she otherwise a competent scholar and teacher, her abortion advocacy, notorious in the community which this faculty serves, would render her entirely unfit to teach in a Catholic and Jesuit university.

Affidavit of Dr. Marjorie Maguire ¶ 8, Exhibit Z (July 24, 1985). Richard R. Roach, S.J. similarly wrote to Father Kelly on March 5, 1984, the plaintiff's "stand as an abortion advocate alone should disqualify her for a position here. The University's Catholic and Jesuit ideals ... should preclude hiring her." *Id.* On March 7, 1984, Joseph Murphy, S.J. explained to Father Kelly that he was troubled by the plaintiff's belief that "a mother determines by willed acceptance the moment when a fetus becomes a person. The mother alone does this, a prerogative referred to the virginal motherhood connected with Mary's *fiat*. . . . If Dr. Maguire's abortion positions are thoroughly mainstream, they are certainly not Catholic." *Id.* Finally William Kurz, S.J. in a memorandum to Father Kelly dated March 7, 1984, objected that the plaintiff's "pro-abortion positions [are] totally offensive to Catholic teaching." *Id.* These letters were originally produced by Marquette as exhibits to the plaintiff's deposition. They were not made part of the formal record in this case, however, until the plaintiff submitted them as exhibits to her own affidavit filed in support of her pendent state law academic freedom claim.

A letter submitted by Marquette in support of its motion for partial summary judgment expressed a sentiment identical to that contained in the letters offered by the plaintiff. Joseph T. Lienhard, S.J. wrote to Father Kelly on November 26, 1980:

> [O]ne of the [plaintiff's] letters of recommendation states that she should not be invited to teach in a Catholic college or university since she is not sympathetic to the goals and values of the Church. Her letters, published in newspapers, and reports of talks she has given elsewhere, demonstrate rather clearly to my mind, at least, that the principal theme of her work is criticism of, and resistance to, the institutional Church.

■ Even if we were to assume *arguendo* that the plaintiff's sex played some role in Marquette's refusal to hire the plaintiff, it is clear, by the plaintiff's own admission and proof, that her sex was not "the motivating or substantial factor" behind the employment decision. *Sherkow,* 630 F.2d at 502. Given the plaintiff's controversial beliefs regarding abortion, Marquette would have reached the same decision even if she were a man. Because as a matter of undisputed fact the plaintiff cannot satisfy the "but for" standard of causation as articulated in *Sherkow* and subsequent decisions of this Court, her claim of sex discrimination under Title VII fails as a matter of law.[3]

After dismissing the plaintiff's Title VII claim, the district court proceeded to review the merits of her pendent state law claim. The plaintiff alleged that Marquette's refusal to hire her because of her views on abortion violated the Wisconsin common law of academic freedom and Marquette's own policies regarding academic freedom. The district court dismissed this claim on two grounds. First it relied on its understanding that the Title VII exemption for religious employers and the First Amendment prohibited a federal court from examining the hiring decisions made by the theology department at Marquette. As an alternative ground the court ruled that the plaintiff had failed to produce any authority for the proposition that either Wisconsin law or the policies of Marquette University extend the principles of academic freedom to hiring decisions.

■ Although we agree that Wisconsin law in no way limits the right of a private university to reject otherwise qualified applicants for positions as professors because of their opinions and beliefs, the district court erred in reaching the merits of the plaintiff's pendent claim. When, as here, the federal claim is dismissed before trial, the district court should relinquish jurisdiction of any pendent state law claim unless there is some independent basis of federal jurisdiction, such as diversity of citizenship. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218; *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 611–612 (7th Cir.1986). A limited exception to this general rule has been recognized where there are pressing reasons for a federal court's retaining jurisdiction over a pendent claim, such as where the statute of limitations has run on filing the pendent claim as an independent lawsuit in state court. *Blau Plumbing,* 781 F.2d at 611. The district court did not articulate, nor does the record reveal, any pressing reasons for retaining jurisdiction over the plaintiff's pendent state law academic freedom claim and it was therefore an abuse of discretion for it to do so.[4]

The district court's dismissal of the plaintiff's Title VII claim is affirmed, but its decision dismissing the pendent claim is vacated.

---

Defendant's Motion for Partial Summary Judgment, Exhibit H (May 20, 1985).

3. Recognizing her error in supplementing her complaint with the state law academic freedom claim, the plaintiff in her reply brief in this Court attempts to argue that she was merely pleading alternative causes of actions as permitted by Federal Rule of Civil Procedure 8(e)(2). First, both the language of the complaint and the plaintiff's arguments to the district court indicate that she intended the state law claim to be a supplemental, and not an alternative, basis for relief. That the plaintiff misunderstood the law of causation in Title VII cases does not allow her now to turn around and argue that the claims were really meant to be pleaded in the alternative. Second, the plaintiff here has done far more than merely to plead that her pro-abortion stance motivated Marquette in its decision not to hire her. Rather to oppose Marquette's motion for partial summary judgment and in support of her state law claim, the plaintiff submitted proof, in the form of the letters set out in n. 2 *supra,* to bolster her contention in her memorandum that the undisputed record in the case revealed that her views on abortion "substantially motivated" Marquette in its decision not to hire her.

4. Marquette did not invoke the rule of *United Mine Workers v. Gibbs* and instead focused its argument solely on the pendent claim's lack of merit. However, because the rule is jurisdictional, we are obligated to raise it ourselves. *Hiley v. United States,* 807 F.2d 623, 626 (7th Cir.1986); *Christianson v. Colt Industries Operating Corp.,* 798 F.2d 1051, 1055–1056 (7th Cir. 1986).