280 N.J. Super. 185 (1994)
654 A.2d 1033
KAREN SABATINO, PLAINTIFF,
v.
SAINT ALOYSIUS PARISH, SAINT ALOYSIUS SCHOOL, AND ARCHDIOCESE OF NEWARK, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided June 20, 1994.
*188 William I. Strasser, for plaintiff (Costenbader, Strasser & Donohue, attorneys).
Eileen P. Mulroy, for defendants (Law Office of William A. Cambria, attorneys).
JULIO M. FUENTES, J.S.C.
Karen Sabatino, who was employed under yearly contracts as principal of a Catholic school, was not rehired as principal when several parishes formed a co-sponsored school. She filed a suit *189 against defendants, St. Aloysius Parish, St. Aloysius School and the Archdiocese of Newark, contending that their failure to offer her the position of school principal in the new school constituted a breach of her employment contract.
The primary question presented by defendants' motion for summary judgment is whether, under First Amendment church-state principles, this court should decide if plaintiff, a lay person, is contractually entitled to the position of principal at a sectarian school.
The relevant facts are summarized as follows. In the fall of 1990, for economic reasons, the Newark Archdiocese approved a plan to create a co-sponsored school district. Pursuant to the plan, parishes in North Caldwell and Roseland, as well as St. Aloysius in Caldwell, formed a co-sponsored Catholic elementary school. The school was to be known as Trinity Academy, and was to be located at the site occupied by St. Aloysius. From 1986 to 1991, Karen Sabatino was employed as principal of St. Aloysius under a series of one-year contracts. Her last contract expired in June 1991.
Acting under guidelines issued by the Archdiocese, all positions in the Academy were opened, and all interested administrators, faculty and staff from the original schools were invited to apply. Specifically, the Archdiocesan guidelines provided that:
If there is no corporate commitment from any religious community in a particular configuration, any one of the incumbent principals may apply for the position of principal in the co-sponsored school. If all of the incumbents choose to apply, they will be interviewed by a Search Committee.... If the Board chooses not to accept any of the candidates, the search will be expanded to include other candidates.... (Emphasis added.)
In January and February 1991, a search committee was formed to find a principal for the Academy. The search committee was composed of nine members: three pastors, one lay representative from each parish, two representatives of the Superintendent of Schools of the Archdiocese, and the committee chairperson. The recommendation of the search committee was advisory; the three *190 pastors were to make the final decision to appoint the new principal.
Before interviewing any candidates, the search committee decided that they would proceed with interviews of Karen Sabatino and one other incumbent principal. The committee then expanded the search to other candidates. After all of the candidates were interviewed, the committee made a recommendation to the pastors that Sister Joan Sullivan be appointed principal.
Defendants contend that Sister Joan was an especially desirable candidate because of her general qualifications, as well as her ability to carry out the religious mission of the school. Defendants thus maintain that their selection of a school principal was guided by religious principle, and made pursuant to their exercise of religious freedom. Accordingly, defendants claim that the court should abstain from reviewing the selection process. Defendants also assert that since plaintiff was employed under a one-year contract which had expired, she had no contractual entitlement to the new position.
The religion clauses embodied in the First Amendment to the Constitution provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, § 1. Although the religion clauses were originally intended to limit only actions by the federal government, the First Amendment has been extended to limit the action of state governments through the Due Process Clause of the Fourteenth Amendment. Everson v. Board of Educ., 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947); see also Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Thus, both state and federal action may be restricted if they impinge upon First Amendment rights. Infringement of First Amendment rights may occur where civil courts interfere with a sectarian school's choice of principal.
A longstanding principle of First Amendment jurisprudence forbids civil courts from adjudicating issues involving religious *191 doctrine or ecclesiastical polity. Presbyterian Church v. Hull Church, 393 U.S. 440, 445, 451-52, 89 S.Ct. 601, 604, 607-08, 21 L.Ed.2d 658 (1969); Watson v. Jones, 80 U.S. 679, 727, 20 L.Ed. 666 (1871); Schmidt v. Bishop, 779 F. Supp. 321, 332 (S.D.N.Y. 1991); Lewis v. Lake Region Conf. of Seventh Day Adventists, 779 F. Supp. 72, 75 (E.D.Mich. 1991); Welter v. Seton Hall Univ., 128 N.J. 279, 608 A.2d 206 (1992); Chavis v. Rowe, 93 N.J. 103, 105, 459 A.2d 674 (1983); St. Nicholas Cathedral of Russian Orthodox Church of North America v. Kedroff, 302 N.Y. 1, 13, 96 N.E.2d 56 (1950), rev'd on other grounds, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). More recently, the United States Supreme Court reaffirmed Watson and held that no essentially ecclesiastical decision made by a religious body, however arbitrary, may be reversed by a secular court. Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 720, 96 S.Ct. 2372, 2385-86, 49 L.Ed.2d 151 (1976), reh'g denied, 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). Restrictions on the free exercise of religion are permitted only when necessary to "prevent grave and immediate danger to interests which the state may lawfully protect." West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943). "[T]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The same principle was recently observed by the New Jersey Supreme Court in Elmora Hebrew Center, Inc. v. Fishman, 125 N.J. 404, 415, 593 A.2d 725 (1991):
Civil adjudications by deference to authoritative decisions by church officials, or by application of neutral principles, must always be circumscribed carefully to avoid courts' incursions into religious questions that would be impermissible under the First Amendment.
Court involvement in religious determinations is "simply inappropriate because judicial scrutiny cannot help but violate the first amendment." Id. at 416, 593 A.2d 725.
This does not lessen the entitlement of religious parties on institutions to civil adjudication of secular legal questions. Id. *192 at 413, 593 A.2d 725. Temporal matters affecting civil, contract, or property rights of a religious body and its members or clergy, may be resolved in a civil court, if the dispute involves purely secular issues and can be resolved without entanglement with the church's faith, discipline or doctrine. Chavis v. Rowe, supra, 93 N.J. at 109-10, 459 A.2d 674; McElroy v. Guilfoyle, 247 N.J. Super. 582, 585-86, 589 A.2d 1082 (App.Div. 1990). In addition, our Supreme Court has recently held that enforcement of employment contracts does not violate the First Amendment where the plaintiff neither performed ministerial functions for the religious organization nor could reasonably have contemplated that compliance with religious doctrine constituted a condition of the employment contract. Welter v. Seton Hall University, supra, 128 N.J. 279, 608 A.2d 206; Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 608 A.2d 218 (1992).
However, religious organizations have an interest in autonomy over their internal affairs including freedom to run their own institutions. Corporation of the Presiding Bishop v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). Churches have the power to decide matters of faith, doctrine, and even internal governance free from state interference. Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Hutchinson v. Thomas, 789 F.2d 392, 394 (6th Cir.), cert. denied, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986); Simpson v. Wells Lamont Corp., 494 F.2d 490, 492 (5th Cir.1974).
For example, in Assemany v. Archdiocese of Detroit, 173 Mich. App. 752, 434 N.W.2d 233 (1988), a church organist filed a discrimination claim under Title VII against the church. The court found that a church organist is intimately involved in the propagation of religious doctrine and the observance and conduct of religious liturgy. On that basis, the function of his position was "clergy," and his discrimination claim was barred by the free exercise clause. In reaching this decision, the court relied upon Rayburn v. General Conf. of Seventh Day Adventists, 772 F.2d 1164, 1168 *193 (4th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). The Rayburn court held:
As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered "clergy" . .. this approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church.
[Id. at 1169 (citing EEOC v. Southwestern Baptist Theological Seminary, 651 F.2d 277, 283 (5th Cir. 1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982))].
See also Chavis v. Rowe, supra, 93 N.J. 103, 459 A.2d 674 (judicial inquiry into propriety of removal procedures followed in "defrocking" deacon would have impermissibly intruded on matters of church doctrine and polity and was prohibited by the First Amendment).
Courts have also held that employment decisions by religious bodies regarding lay teachers in church-run schools, whose duties include teaching religion directly or indirectly, are protected by the Free Exercise Clause from claims under Title VII. In Maguire v. Marquette University, 627 F. Supp. 1499 (E.D.Wis. 1986), plaintiff claimed that a Catholic university's refusal to hire her as an associate professor of theology violated federal civil rights provisions. The court dismissed plaintiff's action, holding that an inquiry into the hiring decisions of the theology department would require the court to immerse itself not only in the procedures and hiring practices of the department but into definitions of what it is to be a Catholic. More specifically, the court stated:
If the court were to grant plaintiff the relief she requests, a place on Marquette's theology faculty, the government would in effect be forcing its interpretation of what Catholicism demands on the university and its students. Such a ruling would not only interfere with the theology department's right to freely exercise its religion through the explication and analysis of Catholicism and other religions, but would also result in a governmental imprimatur of approval on a particular set of belief as "Catholic." The court can no more rule that the plaintiff is not a Catholic than it could find that members of the hiring committee are Catholic.
[Id. at 1503.]
But see Catholic High School Ass'n v. Culvert, 753 F.2d 1161, 1169 (2d Cir.1985) (First Amendment does not prohibit State Labor Relations Board from exercising jurisdiction over unfair-labor-practice *194 complaints lodged against parochial schools by their lay teachers).
In this case, the hiring committee ultimately selected a clergy member rather than a lay person to head the parochial school. While New Jersey case law permits the judiciary to exercise jurisdiction over secular employment contracts within religious institutions, it is well settled that our courts should refrain from addressing disputes involving employees who perform essentially ministerial duties for a parochial school. The selection committee in this case deemed it desirable to have a religious principal who would then be in a position to influence young children. See Tilton v. Richardson, 403 U.S. 672, 686, 91 S.Ct. 2091, 2099-2100, 29 L.Ed.2d 790; Lemon v. Kurtzman, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971) (young, impressionable children attending elementary and secondary schools prove the most susceptible to religious indoctrination).
As in Maguire v. Marquette University, supra, this court is not in a position to determine if the co-sponsored Catholic elementary school should hire a lay person as its principal. Such a determination would clearly interfere with the parish's right to exercise its religion by appointing a nun as school principal. Indeed, the selection of a clergy member as head of a parochial elementary school is not surprising, given the fact that sectarian elementary schools carry out a very focused "religious mission." Committee for Public Education v. Nyquist, 413 U.S. 756, 783, 93 S.Ct. 2955, 2970-71, 37 L.Ed.2d 948 (1973); Lemon, supra, 403 U.S. at 613, 91 S.Ct. at 2111. In Lemon, after detailing the enormous influence religious figures exerted at all levels of the parochial schools, the Court concluded that "[r]eligious authority necessarily pervades the [parochial] school system." Id. at 617, 91 S.Ct. at 2113.
In this case, the new school principal was deemed to be an especially desirable candidate because of her general qualifications, and because of the selection committee's desire to have a nun as principal of a Catholic elementary school. Certainly this religious preference is supported by the fact that three pastors *195 were ultimately charged with the authority to make the final hiring decision. Furthermore, the guidelines provide that:
[T]he congregation is entitled to mission (and/or appoint) the principal and to encourage religious teachers to minister in the school. The congregation, in turn makes every effort to replace the religious principal with another religious and to continue its teaching presence in the school. (Emphasis added.)
There is probably no more important and impressionable a position in a parochial elementary school than that of principal. As long as secular contracts are not violated, an elementary school's decision to fill the position of principal with a clerical applicant should not be subject to judicial scrutiny. For the foregoing reasons, I believe that the First Amendment requires judicial abstention from the exercise of jurisdiction over this case. See Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 608 A.2d 218 (1992).
Finally, as to plaintiff's employment contract claim, I find there is no material issue of fact as to any contractual entitlement. Sabatino's one-year contract expired in June 1991, at which time her school was closed for economic reasons. See Linn v. Beneficial Commercial Corp., 226 N.J. Super. 74, 80, 543 A.2d 954 (App.Div. 1988) (an action for wrongful discharge does not generally lie for one whose loss of work is actuated by elimination of the job itself due to legitimate economic or business reasons); see also Brunner v. Abex Corp., 661 F. Supp. 1351, 1355 n. 3 (D.N.J. 1986). Plaintiff claims, however, that the continued renewal of her yearly contracts, combined with the guidelines' stated preference for hiring an incumbent principal, created a binding contract entitling her to the new position.
Certainly promises contained in employment manuals may in certain circumstances create an employment contract. Nicosia v. Wakefern Food Corp., 136 N.J. 401, 643 A.2d 554 (1994); Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 643 A.2d 546 (1994); Woolley v. Hoffman La Roche, Inc., 99 N.J. 284, 491 A.2d 1257 (1985); Linn v. Beneficial Commercial Corp., supra, 226 N.J. Super. 74, 543 A.2d 954. In Woolley, the Court ruled that personnel manuals distributed to employees can form the basis of employment *196 contracts. Id. 99 N.J. at 297-98, 491 A.2d 1257. However, the rule does not apply to a supervisory employee who had an individual employment contract. Ware v. Prudential Ins. Co., 220 N.J. Super. 135, 143-44, 531 A.2d 757 (App.Div. 1987). Here, Karen Sabatino was clearly employed under an individual contract created for the position of school principal, a supervisory employee. Moreover, there was no manual, indeed no writing, that could be taken to have created any legal relationship between plaintiff and defendants.
The guidelines issued by the Newark Archdiocese represent a series of suggested procedures for parishes to consider in cases of co-sponsorship. The guidelines made no promises and stated no guarantees to any existing employee. Incumbent principals could apply for a post at the newly created school but the final selection did not have to come from that group. In any case, the guidelines were issued by the Archdiocese, a separate entity from plaintiff's employer, St. Aloysius Parish.
Finally, plaintiff's belated effort to amend her complaint to add a count under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, is denied. Actions under the CEPA must be commenced within one year of the date the employee is aggrieved. N.J.S.A. 34:19-5. Young v. Schering Corp. & Brokken, 275 N.J. Super. 221, 645 A.2d 1238 (App.Div. 1994). Here, the plaintiff seeks to file a claim under CEPA over three years after her cause of action arose. The claim is not saved by R. 4:9-3, which permits an amendment to relate back to the date of the original pleading when the action arises out of the conduct, transaction or occurrence set forth in the original pleading. Plaintiff's original complaint sets forth a cause of action grounded in breach of contract. Plaintiff now asserts the claim that her discharge was in retaliation for a number of unpopular actions she took while performing her duties as principal. N.J.S.A. 34:19-2e. This theory of liability is totally distinct from the breach of contact claim contained in the original complaint. On this subject, the Appellate Division recently observed:

*197 "While the relation-back provided for by this rule does not authorize amendment of the pleading to allege a new cause of action against another party to the litigation which is barred by the running of the statute of limitations, the test as to what constitutes a new cause of action is somewhat elusive of definition." Pressler, Current N.J. Court Rules, comment 1 on R. 4:9-3. In interpreting this rule, we must be mindful of the general proposition that "an entirely new and distinctly different cause of action cannot by means of an amendment of the pleadings be introduced after the statute has tolled the action." Welsh v. Bd. of Ed. of Tewksbury Tp., 7 N.J. Super. 141, 145 [72 A.2d 350] (App.Div. 1950); see also Harr v. Allstate Ins. Co., 54 N.J. 287, 299 [255 A.2d 208] (1969); Tackling v. Chrysler Corp., 77 N.J. Super. 12, 16 [185 A.2d 238] (Law Div. 1962); Levey v. Newark Beth Israel Hospital, 17 N.J. Super. 290, 292-294 [85 A.2d 827] (Law Div. 1952). Additionally, the notion of liberality in permitting amendments is not "intended to afford a refuge to languid and dilatory litigants." Welsh v. Bd. of Ed. of Tewksbury Tp., supra, 7 N.J. Super. at 146 [72 A.2d 350]; see also Branch v. Emery Transportation Co., 53 N.J. Super. 367, 375 [147 A.2d 556] (App.Div. 1958).
[Young v. Schering Corp. & Brokken, supra, 275 N.J. Super. at 230-31, 645 A.2d 1238.]
Plaintiff's claim under CEPA fails for another reason. Plaintiff has not suffered a "discharge, suspension or demotion" as envisioned by N.J.S.A. 34:19-2e. To discharge means "to dismiss from employment; to terminate the employment of a person." Black's Law Dictionary 463 (6th ed. 1990). As I stated previously, plaintiff's yearly employment contract had expired in 1991. She was not offered a new one. Thus, no employment existed from which plaintiff could be dismissed or terminated. Plaintiff simply was not rehired.
Accordingly, the motion for summary judgment dismissing the complaint is granted.