Joginder Kumar MAKHIJA, Plaintiff,

v.

**DELEUW, CATHER AND COMPANY, Defendant.**

No. 82 C 881.

United States District Court, N.D. Illinois, E.D.

July 20, 1987.

Irene Savanis, Chicago, Ill., Keith C. McDole, Dallas, Tex., for plaintiff.

Edward J. Zulkey, Gerald L. Maatman, Baker & McKenzie, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

Joginder Kumar Makhija ("Makhija") has sued his former employer DeLeuw, Cather and Company ("DeLeuw") for its alleged discrimination against him because of his national origin (Makhija was originally from India). Makhija's claim is asserted under Title VII, 42 U.S.C. §§ 2000e to 2000e–17. This Court has conducted a bench trial and received post-trial submissions from the litigants, and it now finds the facts specially and states its conclusions of law thereon, as required by Fed.R. Civ.P. 52(a), in the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"). To the extent (if any) the

following Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

### Findings of Fact[1]

*Parties and Pretrial Proceedings*

1. Makhija claims he was discriminated against on the basis of his national origin by his former employer, DeLeuw, when he was terminated in May 1975 on the pretext that he took two vacation days without authorization. In addition, Makhija claims DeLeuw's overt discrimination had become clear at least by mid-March 1975, when Makhija's request for a promotion was denied unjustifiably.[2]

2. DeLeuw claims Makhija was properly terminated for taking an unauthorized vacation during a critical deadline period for a specific project.

3. Makhija filed this action February 16, 1982, less than 90 days after he received a Notice of Right to Sue ("right-to-sue letter") from the Equal Employment Opportunity Commission ("EEOC"). Makhija had long before instituted timely administrative proceedings by filing charges against DeLeuw with EEOC on June 4, 1975 and with the Illinois Fair Employment Practices Commission ("FEPC") on June 10, 1975. After conducting an investigation, EEOC determined there was reasonable cause to believe (a) Makhija was discharged because of his national origin and (b) DeLeuw's alleged basis for discharging Makhija was a pretext. On July 17, 1981 EEOC issued a written determination to that effect.[3] (PXs 26, 39, 64)

4. Initially Makhija represented himself pro se and proceeded with substantial discovery and the briefing of DeLeuw's Motion for Partial Summary Judgment. This Court's May 30, 1983 unpublished opinion denied that motion. Thereafter this Court appointed Makhija's present counsel to represent him.

*Makhija's Background and Credibility*

5. Makhija was born and raised in India. Although his parents spoke mainly Hindi, from the beginning Makhija was educated bilingually in Hindi and English. By the time he was in high school most of his studies were conducted in English. After finishing high school Makhija attended Dayal Bagh Technical College for three years and received a diploma in electrical engineering in 1964. All the courses there were conducted in English. (Makhija Test.; Facts ¶ 3)

6. In 1965 Makhija came to the United States, where he received three degrees (Facts ¶ 3):

(a) a Bachelor of Science Degree in Mechanical Engineering from Chicago Technical College ("CTC") in 1967;

(b) a Bachelor of Science Degree in Industrial Engineering from Illinois Institute of Technology ("IIT") in 1973; and

(c) a Master of Science Degree in Industrial Engineering from IIT in December 1974.

In August 1970 Makhija became a permanent resident of the United States. On

---

1. All references to exhibits will take the form "JX—" (for joint exhibits), "PX—" (for Makhija's exhibits) and "DX—" (for DeLeuw's exhibits). Deposition testimony will be cited "[deponent's name] Dep.—," while trial testimony will be cited "[witness' name] Test." Uncontested facts drawn from the Final Pretrial Order ("FPTO") will be cited "Facts ¶—." All references to Title 42 provisions will take the form "Section—."

2. In an August 13, 1985 oral ruling this Court denied Makhija's motion to amend his Complaint to assert a separate failure-to-promote claim. That allegation by Makhija, however, is relevant to the extent it is probative of DeLeuw's discriminatory intent in terminating Makhija and to the extent it bears on Makhija's damages caused by his termination (see page 13 of this Court's slip opinion referred to in Finding 4).

3. No explanation was offered at trial as to the extraordinary delay in processing Makhija's claim at the administrative level. Though Makhija was not then represented by counsel, on the face of things it would seem unreasonable for him to have let more than six full years pass in that manner. For the reasons dealt with in later Findings and in the Conclusions, however, that does not defeat Makhija's claim.

October 21, 1982 Makhija became a United States citizen. (Facts ¶ 1)

7. After graduating from CTC in 1967 and before he was hired by DeLeuw, Makhija performed mechanical engineering and related work for several engineering firms: C.F. Murphy Associates, A. Epstein & Sons (after which he left for an extended visit to India), Environmental Systems Design, Inc. and Pace Associates (Makhija Test.; JX 6 at 22). No evidence suggests his work with any of those engineering firms was other than satisfactory.

8. Makhija's trial testimony demonstrated him to be both articulate and intelligent. At present he holds a highly responsible position as Chief of Engineering at Hansen, Lind & Meyer, a Chicago engineering firm. Subject only to the commonly encountered phenomenon that parties litigant, as witnesses, often tend to recall certain events in a light most favorable to themselves,[4] Makhija was a highly credible witness. These Findings for the most part credit his testimony—where they do not, that is the product of this Court's sense that the qualifying factor stated in the preceding sentence was unintentionally at work.

*Makhija's Work with DeLeuw Through Late 1974*

9. DeLeuw is an Illinois corporation having its principal place of business in Chicago. It does business throughout the world, providing consulting, engineering and planning services. (Facts ¶ 2)

10. There was conflicting testimony between DeLeuw's former Chief Mechanical Engineer Edmund Sebastian ("Sebastian") and its former Personnel Manager John O'Connor ("O'Connor") as to whether or not DeLeuw was administered in a decentralized manner under which department heads made most employment decisions, including hiring, promotion and termination determinations (O'Connor said "yes"; Sebastian said "no"). This Court resolves that conflict in O'Connor's favor.[5] It is a reasonable inference (and a reasonable reconciliation of the two men's conflicting testimony), and this Court finds, that even if certain of those decisions may have technically called for formal approval from an executive vice-president or head of the Chicago office, in practical and realistic terms they were made by department heads such as Sebastian and his predecessor as Chief Mechanical Engineer, Harry Watson ("Watson"), whose recommendations would consistently be confirmed by the executive vice-president or head of the office. Indeed, that was the essential thrust of the testimony of now-retired DeLeuw Executive Vice-President John Linden ("Linden") (Linden Dep. 20–21, 22–23, 31–32). Thus all such personnel decisions and commitments made by Watson or Sebastian may fairly be viewed as having been made by DeLeuw itself.

11. On October 6, 1972 DeLeuw hired Makhija for its Mechanical Engineering Department in Chicago. Watson (who died in 1978) was then Chief Mechanical Engineer at DeLeuw's Chicago office and remained in that position until October 1974, when Sebastian succeeded him. (Facts ¶ 5; Makhija Test.)

12. Only Watson interviewed Makhija for the DeLeuw position. After questioning Makhija on his technical and educational background, Watson immediately offered Makhija a position at a monthly salary of $1085. Initially Makhija hesitated to accept the job at that salary level, because he did not think it was commensurate with his background and experience, but he accepted the position after Watson assured

---

**4.** This should not be mistaken as a reference to knowingly false testimony. Rather it recognizes the human tendency, in dredging up events in the now-distant past, to think of how they "must have" occurred rather than being able to produce a totally accurate recollection of things that were never contemporaneously recorded.

**5.** Among other reasons, Sebastian was the De-Leuw employee who triggered Makhija's termi-

nation and was the target of Makhija's discrimination claim. That set of circumstances gave him a substantial motive to color his testimony. Indeed, based on his demeanor and the inconsistency of his story with that of various other witnesses (most of whom were DeLeuw's own people), this Court found Sebastian a highly noncredible witness in a number of material respects.

him not to worry and that "we'll take care of you." (Makhija Test.; PX 4)

13. At all relevant times DeLeuw had a policy and practice of classifying its professional engineers into various grades for the purpose of determining salary and job responsibilities. Those grades ranged from a low of Grade I to a high of Grade VIII, with various classifications and a range of pay scales within each grade. Makhija was hired as a Grade II mechanical engineer. (Makhija Test.; PX 2)

14. It is clear (based not only on Makhija's own statements but on the objective evidence discussed in this and later Findings) that during the time he was Makhija's supervisor Watson was pleased with Makhija's work and with his ability and progress as an engineer. Based on Watson's recommendations Makhija received several salary increases and promotions:

(a) January 28, 1973—salary raised to $1,110 per month (PX 2);

(b) November 8, 1973—salary raised to $1,225 per month and promoted to Grade III (PX 4); and

(c) June 15, 1974—salary raised to $1,325 per month (PX 10).

Because of Makhija's low starting salary, those increases still did not bring him to a pay level commensurate with his experience and education. That however did not reflect any discrimination based on his national origin (or any other invidious form of discrimination).

15. In 1973 and 1974 Makhija attended evening classes in industrial engineering at IIT. On Watson's recommendation DeLeuw paid Makhija's tuition there. DeLeuw's policy was to pay tuition for courses that were mutually beneficial to both DeLeuw and the employee. (PX 3; O'Connor Test.)

16. In 1973 and 1974 Makhija worked with Watson on a solar energy project for TRW, Inc. (the "Solar Energy Project"). Makhija carried substantial responsibilities on the project and had substantial direct contact with the client, both by telephone and in writing. Makhija was responsible for drafting several monthly reports for editing by Watson. At the end of the project Makhija and Watson compiled an extensive final report[6] (PXs 5, 6, 7, 8 and 9). Makhija's work on the Solar Energy Project was substantially beyond the usual duties of a Grade III engineer. At that time DeLeuw did not customarily assign the writing of reports to engineers below Grade V. (PX 27; Brandon Dep. 25–26)

17. Makhija's involvement in the Solar Energy Project demonstrated Watson's confidence in Makhija's capabilities and progress as an engineer, because the project was a difficult task that related to a newly-developing area of engineering and required a substantial amount of creative thinking and sophisticated analysis. Both the difficulty of the project and Watson's having reposed an unusually high level of responsibility in Makhija confirm the high degree of confidence Watson had in Makhija. (Brandon Dep. 25–27). From the other evidence as to Watson's continuing confidence in Makhija (see, e.g., Finding 18 and Finding 48 n. 13), Makhija's performance on the Solar Energy Project confirmed his quality was well above that of the level at which he was being compensated.

**6.** Sebastian's testimony sought to minimize Makhija's involvement in the Solar Energy Project and to denigrate the quality of Makhija's work in that respect. Conversely, Makhija's testimony may well have reflected his own perception of his abilities, and hence the normal tendency toward self-bias. Brandon's laudatory opinion of Makhija's work is substantially but not fully probative, because he had no means of separating Makhija's efforts on the Project from Watson's (though Brandon was undoubtedly right in ascribing the astute analytical approach, in a scientific field then in its infancy, to Makhija—and Brandon viewed the work as far above the capabilities of a Grade III engineer). For these reasons this Court has not fully accepted Makhija's version, but the evidence as to his work on the Project is significant in at least two respects:

1. It is objective evidence of the confidence Watson had in Makhija and the value Watson placed on Makhija's services.

2. Sebastian's adverse testimony shows a continuing bias against Makhija, corroborative of Makhija's claim as to the discriminatory motive of Sebastian (and hence of DeLeuw) in Makhija's termination.

18. Watson's (and therefore DeLeuw's) satisfaction with Makhija's performance are further confirmed by the recommendations that Makhija was given by Watson and another supervisor when Makhija applied for his professional engineer's license. Watson described Makhija as "an intelligent, well educated and resourceful engineer." Ben Golber ("Golber") said Makhija was "fully capable" of directing engineering work. Except for Sebastian (whose testimony was suspect and is not credited in this as in other respects), there is no evidence that any of Makhija's supervisors ever criticized his work or his ability to communicate in English. Indeed, Golber spoke of his English as "excellent" (a view consistent with Makhija's testimony at trial). PXs 11 and 12; Makhija Test.; Golber Dep. 32)

19. Former fellow workers of Makhija at DeLeuw testified he was well-liked and respected (Stanisz Test.; Gulino Test.). No evidence was offered to the contrary. Makhija also was respectful of and obedient to the rules established in the work place by DeLeuw.[7] From the day he started work at DeLeuw through May 22, 1975 Makhija never was disciplined by DeLeuw for any reason.. (Makhija Test.)

20. In the fall of 1974 Makhija asked Watson to provide a reference for Makhija's application for the Illinois professional engineer's license. In the course of that discussion, Makhija reminded Watson that at the end of 1974 he would be receiving his master's degree and taking the professional engineer's examination, which Makhija felt he would pass, and said that he should therefore be considered for a promotion. Watson told Makhija that after he received his license and master's degree a promotion would indeed be appropriate. Makhija's testimony goes farther (quoting from his Proposed Finding 25):

> [A]t that point they agreed that Makhija's salary should be raised by $4,000. Later that same day Watson approached Makhija in a very happy mood and told Makhija that he had just spoken to J.E. Linden ("Linden"), the Executive Vice-President of DeLeuw, and that Makhija would be given a $4,000 raise after obtaining his master's and his license. During that conversation Watson commented to Makhija that "I told you when I hired you we will take good care of you. I'm happy with your work."

Linden (now retired) denied any such conversation (Linden Dep. 36, 70, 72–73).[8] More significantly in terms of objective evidence, Makhija's own March 11, 1975 letter to Sebastian (PX 25) "request[ing] re-evaluation of my engineering grade and salary" said only this:

> Before Mr. Harry Watson transferred from the Chicago office, he had considered giving me increased responsibility with regard to work, as soon as I completed my Master of Science in Industrial Engineering. He had also discussed the matter with Mr. Ed Linden.

---

7. Sebastian testified Makhija's "attitude was not the best," that he was bored with his work and that Sebastian caught him reading a magazine at his desk on "at least" one occasion. Golber said he thought Makhija seemed to consider drafting work beneath him once he got his professional license and his master's degree (though Golber's testimony generally reflected a somewhat superior attitude toward younger engineers who had acquired academic credentials but not many years of practical experience (see, e.g., Golber Dep. 9, 37–38)—Golber was himself in his late 60s (PX 55), a veteran of some 45 years in the profession, Golber Dep. 3). In any event, like Sebastian's insertion of post-hoc fabricated reasons for Makhija's termination in Sebastian's response to EEOC (JX 2), Sebastian's testimony must be viewed as either a later rationalization or as a further reflection of Sebastian's bias against Makhija.

8. Linden's denial of *any* conversation with Watson on the subject of Makhija's promotion is rejected by this Court. This Finding later quotes Makhija's June 9, 1975 letter to Linden (PX 40), with its "You may recall ..." sentence. When Linden answered on June 13 (PX 16), he spoke not a word of denial of having talked to Watson about Makhija and his future promotion—when he might have been expected to deny a *false* claim (remember he was answering Makhija's complaint of unfair treatment). In light of the facts referred to in this Finding, this Court concludes Watson (a) did plan to promote Makhija at the time specified in this Finding and Finding 21 and (b) did confirm that with Linden, obtaining Linden's general concurrence, but (c) did not promise a raise of $4,000 (or other specific amount) yearly.

And Makhija's June 9, 1975 letter to Linden (PX 40), complaining of Sebastian's having fired him, similarly mentioned no dollar commitment:

I was hired by this company October 1972 by Mr. Harry P. Watson. I have worked hard at my job with the company and also went to evening school. During this period I obtained a B.S. and an M.S. in I.E. from I.I.T., Chicago. About three months ago I also passed the Professional Engineer's examination. Mr. Watson was very happy with my work. You may recall he was considering me for a promotion and had talked to you about me. I was regular in attendance and you can get a reference on my character and work from Mr. Watson.

21. Based on all the evidence (including this Court's resolution of credibility issues):

(a) Watson specifically contemplated a promotion and raise for Makhija upon the latter's obtaining his master's degree and his license as a professional engineer. If Watson had remained as department head when those conditions were satisfied, he would have recommended—and Makhija would have received in the regular course of DeLeuw's personnel practices—such a promotion and raise.

(b) Watson made no commitment that the amount of Makhija's raise would be $4,000 annually. It is highly likely, given Makhija's current recollection, that during the course of their discussion Watson referred to that range of possible increase, rather than a specific commitment—that view is consistent with Makhija's letters when the matter was much fresher in his mind (see Finding 20). With the passage of years Makhija's recollection has undoubtedly converted the discussion into one of specific agreement (see n. 4).

(c) In a comparatively small organization such as DeLeuw's Mechanical Engineering Department, with so many possible variables in levels of education, experience and skill, the establishment of precise parallels is difficult. Taking all such factors into account, however, it is a reasonable inference—and this Court finds—Watson would have raised Makhija's salary to $1,600 per month by June 1975. Although that was the same salary that had been paid to Alan Behring ("Behring") as of March 1975 and was just below the $1,620 being paid to Robert Prochaska ("Prochaska") at that same time, those two engineers received raises as part of the annual raises implemented in June 1975 (Behring to $1,740, Prochaska to $1750). Thus a $1,600 salary level for Makhija would have lifted him substantially to the salary level those engineers were just leaving (something commensurate with his newly-attained professional stature), without creating in-office sources of disruption due to perceived disparate treatment.[9]

(d) Had Watson been succeeded as Chief Mechanical Engineer by anyone

---

**9.** DeLeuw's Proposed Findings 25–32 make disparaging comparisons of Makhija vis-a-vis Behrens and Prochaska. Those ignore the fact that a raise that would bring Makhija to a salary level Behrens and Prochaska were just leaving would not imply Makhija had qualifications, skills and experience equivalent to theirs—quite the contrary. Moreover:

(a) Behrens' Ph.D. degree (of which DeLeuw makes a good deal in the comparison) was not the triggering event for Behrens' promotion from Grade IV to Grade V, but that was rather occasioned by Behrens' receipt of his professional engineer's certificate (PX 18, 19). That lends probative force to Makhija's account of Watson's promise of a promotion connected with the same event.

(b) Prochaska brought no formal qualifications (that is, no college degree) to the job. Obviously his strength lay in his many years of practical experience, but the experience did not lie in the area of DeLeuw's Mechanical Engineering Department (designing mechanical engineering systems for buildings) (PX 45 at 3).

(c) Makhija's combination of qualifications, skills and experience placed him only a rung below each of Behrens and Prochaska, a ranking reflected in the text's Findings.

Finally, the $1,600 monthly salary this Finding settles on for Makhija is substantially consistent with Brandon's expert opinion that Makhija should then have been earning somewhere in the range of about $20,000 a year (Brandon Dep. 35)—whereas $1,700 monthly (the figure on which the PX 33 calculations were based) was also in the $20,000 annual range, but would likely have presented organizational problems of the kind mentioned in the text and would therefore be an unlikely salary for Makhija.

not motivated by bias in dealing with Makhija (that is, by someone other than Sebastian), Makhija would have received the same recommendation and promotion, and at the same time, as reflected in Finding 21(c).

*Makhija's Employment with DeLeuw During Sebastian's Tenure*

22. In October 1974 Watson was transferred to DeLeuw's office in Seattle, Washington. Sebastian thereupon became the Chief Mechanical Engineer in DeLeuw's Chicago office and Makhija's immediate supervisor. (Fact ¶ 15, Makhija Test.)

23. Sebastian had been hired by DeLeuw August 3, 1973 as a Grade VII engineer assigned to the Mechanical Engineering Department. Before joining DeLeuw Sebastian had worked at six different engineering positions and had been self-employed for about four years. After leaving DeLeuw in April 1978, Sebastian worked a few years at two different engineering firms and then became self-employed. (Sebastian Test.; PX 54)

24. Makhija had continued to attend evening classes at IIT during and after Watson's tenure at the Chicago office. In December 1974 Makhija received his Master of Science Degree in Industrial Engineering. In December 1974 Makhija also took the Illinois professional engineer's license examination. In early March 1975 Makhija was notified that he had passed his licensing examination. (Makhija Test.; Facts ¶ 3)

25. On March 13, 1975 Linden sent Makhija a letter (PX 38) complimenting him on becoming registered as a professional engineer in Illinois and notifying him of a salary increase of $50 per month effective March 10, 1975. It was DeLeuw's standard practice to grant an engineer such a $50 increase upon being licensed. That token increase was not initiated by Makhija's supervisor. (Sebastian Test.; Facts ¶ 9)

26. Before becoming Chief Mechanical Engineer, Sebastian was never Makhija's supervisor on a specific project, nor did he ever evaluate Makhija's work. Sebastian knew Watson thought Makhija "had the potential of developing into a good engineer," and Sebastian had never heard any complaints or criticisms from any of Makhija's supervisors. (Sebastian Test.)

27. On March 11, 1975 Makhija wrote Sebastian a memorandum requesting a re-evaluation of his salary and engineering grade, sending a copy to Personnel Manager O'Connor. At that time Makhija was classified by DeLeuw as a Grade III engineer with a monthly salary of $1,325. (Makhija Test.; PX 25)

28. After receiving that memorandum Sebastian called Makhija into his office and said giving Makhija a grade promotion or even a raise was a problem because Makhija was a citizen of India and not a citizen of the United States. Makhija explained to Sebastian that he was an immigrant with permanent residency status, which is the initial step to citizenship. Sebastian responded:

> Don't give me all that about being an immigrant—my father was an immigrant.

Though Sebastian's version of the conversation was different, he admitted having a conversation with Makhija at that time about promotion, admitted Makhija told him he was an immigrant and acknowledged he may have referred to his own father having been an immigrant. Makhija's account is more credible and is credited by this Court—there appears no likely reason for the subject of Makhija's immigrant status having come up (as Sebastian admitted it did) unless *Sebastian* had raised citizenship as a problem affecting Makhija's requested promotion and raise.[10] (Makhija Test.; Sebastian Test.)

29. It is true that DeLeuw followed a pattern of implementation of office-wide pay raises on an annual basis, generally in

---

10. Makhija's version is further corroborated by the fact he shortly thereafter told one of his colleagues, Jerome Stanisz of DeLeuw's Electrical Engineering Department, that his conversation with Sebastian had led him to believe the latter was not going to promote him because of his non-United States citizenship (Stanisz Test.).

June. But that was certainly not the only occasion for raises (two of Makhija's three raises had come in January and October, and the record reflects other engineers also received raises at other times of the year). Moreover DeLeuw's own Proposed Finding 22 says:

> Moreover, any pay raise or promotion would have to be passed upon by executive officials of DeLeuw, and if a pay raise or promotion was granted, that decision would take up to two months to implement.

Thus Makhija's March 1975 request was certainly a timely one for consideration and evaluation, whether or not it were to be implemented before June 1975.

30. Despite the facts stated in Finding 29, Sebastian did not even investigate whether Makhija deserved a raise, either before or after denying Makhija's request. Sebastian did not call Watson to see whether he had promised Makhija a raise, although Sebastian was aware Makhija contended Watson had. Sebastian never reviewed any of the salary revision memoranda for Makhija prepared by Watson, nor did he talk to any of the engineers that worked with Makhija. Sebastian did not take any of those actions even though he knew a recommendation for a promotion or raise could then be initiated only by a department head, such as himself. (Sebastian Test.)

31. Within a few days Makhija went to O'Connor and told him Sebastian had refused to give him a promotion and raise because of his nationality. O'Connor responded DeLeuw did not have a grievance procedure, the company was not a manufacturing plant, and Makhija had to either listen to Sebastian or look elsewhere for a job. (Makhija Test.) No one else at DeLeuw then conducted any type of investigation as to whether Makhija was entitled to a promotion (O'Connor Test.)

32. Sebastian's denial of Makhija's request for a promotion and salary increase was due to Makhija's national origin. That factual conclusion is derived from the entire relevant record, including but not limited to the following:

(a) Watson's determination of Makhija's entitlement to a promotion and raise when he obtained his advanced degree and license [11] is the best objective evidence on what would have been done in the absence of bias.

(b) Sebastian's only stated reason for his denial of Makhija's request was Makhija's lack of United States citizenship, which may fairly be viewed as a euphemism for his Indian origin.

(c) No individual of Indian origin was hired during the period Sebastian was Chief Mechanical Engineer, though Sebastian believed DeLeuw received applications for employment in the Mechanical Engineering Department of DeLeuw's Chicago office from such individuals during that period.

(d) Sebastian's response to EEOC, when Makhija later complained of his having been fired by Sebastian for a discriminatory reason, advanced several totally pretextual reasons—admittedly so (see Finding 47). That fact justifies the drawing of an adverse inference as to Sebastian's true motive.

(e) Sebastian's non-credible testimony during the trial supports the same kind of adverse inference.

(f) DeLeuw's current purported justification for Sebastian's failure to act on Makhija's request, based on its purported untimeliness, is pretextual (see Findings 29 and 30). It in no way avoids this Finding's adverse inferences and conclusion as to Sebastian's true motive.

*Makhija's Firing*

33. On May 23 and May 27, 1975 Makhija took a two-day vacation from DeLeuw (those were the two work days

---

**11.** DeLeuw seeks to emphasize Makhija's master's degree was in industrial rather than mechanical engineering. That is not really the point, though, given the fact Watson was looking at the anticipated combination of factors— more particularly the professional engineer's license—as evidencing Makhija's advancement, and the advanced degree would reflect professional growth and industriousness even though not directly focused on job-related training.

bracketing the Memorial Day holiday weekend). Before doing so Makhija followed the customary procedure for informing his supervisor of his vacation plans and for obtaining the appropriate authorization:

(a) Each DeLeuw department maintained a vacation chart, which each employee signed when he or she knew his or her vacation plans and which was reviewed periodically by the department head. Generally the chart was maintained by either the department head or his secretary. (Linden Dep. 56–57; PX 57)

(b) In May 1975 Sharon Gulino ("Gulino") was the secretary for the Mechanical Engineering Department as well as for Sebastian. At that time the department's vacation chart was stored in Sebastian's file cabinet (Gulino had no reason to keep the chart, because she was not responsible for assigning work to engineers or for taking their messages when they were out of the office). (Gulino Test.)

(c) About two weeks before the May 1975 Memorial Day weekend, Makhija filled in the vacation chart to indicate that he planned to take vacation days on May 23 and May 27 (Gulino had gotten the chart from Sebastian's desk so Makhija could fill it in). (Makhija Test.; Gulino Test.)

(d) Sometime before May 23 Gulino saw Sebastian review the vacation chart with the Makhija entry, and she believed she also saw Sebastian and Makhija with the vacation chart and talking (PX 58 ¶ 3; Gulino Test.). This Court finds Gulino was mistaken in the latter belief, but it does credit her testimony about having seen Sebastian review the chart before May 23 (that testimony is consistent with other credible testimony).

(e) Just before leaving on his vacation Makhija went to see Sebastian to confirm that he had reviewed the chart, but Sebastian was not in his office (he himself had been away since May 20). Gulino told Makhija Sebastian had seen the chart. (Makhija Test.)

(f) Sebastian was away from the office on May 20 through 22. Before he left he did not complain to Makhija about the latter's planned vacation days. (Makhija Test.) Nor did any other supervisor or person in authority at DeLeuw complain to Makhija about his vacation plans or ask Makhija not to take a vacation May 23 or May 27 (see also Finding 36).

34. Sebastian painted a very different (and not at all credible) picture of the vacation chart and its uses. According to him the chart was maintained by *Gulino* "for her own convenience" and was not to keep track of vacations (that testimony was directly refuted by PX 57, DeLeuw's own letter to EEOC describing the chart as the "normal procedure" for scheduling vacations as described in Finding 33(a)—and as to which Sebastian testified he didn't know of that "normal procedure"). In any event Sebastian admitted he did not pay much attention to the chart. Sebastian also admitted (a) there was no written policy or guideline requiring notification of vacations, (b) the engineers did not have to request a vacation in writing and (c) Sebastian never told engineers that they would be terminated if they did not talk to him before taking a vacation. (Sebastian Test.)

35. In May 1975 Makhija and four other Mechanical Engineering Department employees were working on a project involving sluice gates for the Metropolitan Sanitary District (the "MSD Project"). Golber was in charge of the phase of the MSD Project on which Makhija was working. In mid-May the department was working on a preliminary design stage, which involved completing approximately 14 drawings and submitting them to the client by the target date of June 5. At that time the MSD Project was on schedule and *not* in a critical stage. (Makhija Test.; Stanisz Test.; PX 65 ¶ 4) No overtime had been approved for the MSD Project at that time (Sebastian Test.). In summary, there was nothing about the nature or stage of the Project that made Makhija's presence at work May 23 and 27 a critical factor, or made his absence at that time a problem of any magnitude.

36. That noncritical nature of Makhija's absence is really confirmed by Golber's testimony (on which DeLeuw seeks to rely). Golber says that Sebastian, before he left the office May 20, told Golber he could have Makhija work with him on a specific project on May 22 and 23 (Golber Dep. 17). But Makhija was unaware of that, and even Sebastian did not testify he told Makhija of such an assignment (Sebastian Test.). Before leaving on his already-scheduled vacation, Makhija told Golber (who was in charge of the office in Sebastian's absence) Makhija was planning to take two vacation days beginning May 23. Golber then told him of Sebastian's statement, but Golber did not tell Makhija not to go, did not try to reach Sebastian, and did not reassign the project to another engineer (Golber Dep. 18, 21). It is clear that the work that DeLeuw claims (unpersuasively) was not completed because of Makhija's unavailability did not involve a critical deadline—as Golber testified (Dep. 19–20):

Q. Okay. Was there a deadline for this report to be—for your part of it to be turned over to Mr. Sebastian?

A. There was not so much a deadline involved as a desirable goal for the moment. But there was nothing of an ir-remediable—irremediable? Is that the word?—there was nothing of a particularly important nature about it. Just a desirable goal for the time.

Q. What was that desirable goal?

A. Pardon me?

Q. What was the desirable goal?

A. To get the report in. It was a project report. It was not a deadline, it was a progress report.

Q. Was there a target date chosen by which everybody was hoping to have the report done?

A. No.

Q. Just as soon as possible. Is that . . .

A. It was a progress report that was made periodically, not necessarily monthly, not necessarily weekly, but from time to time.

Of course, we wanted to let the Sanitary District know, through the contact man, where we stood on the job.

37. Despite the facts stated in the preceding Findings, on Tuesday evening May 27, 1975 Makhija returned home from his vacation and found a telegram and letter from De Leuw, each dated May 23 and bearing O'Connor's signature, saying Makhija had been terminated:

(a) PX 14, the telegram, said Makhija's termination was necessitated by his "unauthorized absence during critical phase of [MSD Project]."

(b) PX 15, the letter, said:

Messrs. Boyd and Sebastian were dismayed to hear that you had taken it upon yourself to take time off without authorization at a time when a critical deadline has to be met on the project to which you were assigned.

That night Makhija immediately called Watson, who was surprised at the termination and said there must be a mistake and Makhija should go talk to Sebastian. (Makhija Test.)

38. Next morning Makhija went to DeLeuw and met with Sebastian in the latter's office to ask why he had been fired. Sebastian said it was because Makhija did not get Sebastian's permission before going on vacation. When Makhija said he had both put the vacation plans on the vacation chart and told Golber of the plans, Sebastian acknowledged he might have seen the chart but simply repeated Makhija had not obtained his permission. Sebastian said it had been *O'Connor's* decision to send the termination notices—he did *not* say the decision was his own, nor did he make any mention whatever of John Boyd ("Boyd") (who was DeLeuw's Senior Vice President in charge of the MSD Project) as having been at all involved in the termination decision. Sebastian then told Makhija his educational background did not fit in well with the Mechanical Engineering Department and he ought to go somewhere else—that he might be better off in a different line of work. (Makhija Test.)

39. Makhija immediately went to see O'Connor. O'Connor said Sebastian had

told him there was a "critical deadline" on some work Makhija was supposed to have completed on the MSD Project. When Makhija responded that was not until June 5, O'Connor said Sebastian had told him May 23 (clearly a false statement by Sebastian). O'Connor also told Makhija it was *Sebastian*'s decision to send the letter and telegram and the decision was final. (Makhija Test.)

40. Linden also confirmed it was Sebastian, and not O'Connor or Boyd, who made the decision to fire Makhija (Linden Dep. 53–54). And Golber testified that a few days after the firing Sebastian had told him "*I've* let him [Makhija] go" (Golber Dep. 23, emphasis added), again with no mention of either O'Connor or Boyd having been involved in the decision.

41. Though at trial O'Connor initially said Boyd had decided to terminate Makhija, on cross-examination it turned out O'Connor had never talked to Boyd on the subject. Instead O'Connor had relied entirely on Sebastian, who told him Boyd wanted Makhija terminated. O'Connor detected a sense of urgency from what Sebastian told him and, when he tried without success to reach Makhija at home, he chose to send the mailgram and letter. O'Connor thus relied solely on Sebastian's directives both as to the firing and as to the justification asserted in the mailgram and letter. (O'Connor Test.)

42. At trial Sebastian claimed Boyd had made the decision to terminate Makhija after Sebastian had told Boyd (in response to the latter's inquiry on the MSD Project's status) simply that Makhija had been on vacation. Sebastian said Boyd stated no reason for terminating Makhija, though Sebastian knew of no other reason except Sebastian's input. According to Sebastian, he did not communicate any "sense or urgency" when he told O'Connor of "Boyd's" termination decision, and O'Connor took it on himself to notify Makhija as he did. (Sebastian Test.) All of that testimony was a total fabrication.

43. There can be no reasonable doubt that the decision to terminate Makhija was actually initiated solely by Sebastian, although he has tried to shift the responsibility to Boyd (who has been dead since 1978) and O'Connor. Even if Boyd were found to have played any part in the decision, on Sebastian's own testimony he would have done so solely on the basis of Sebastian's input (as did O'Connor). Under any view of the evidence, it is Sebastian's motives and intent that are ascribable to DeLeuw.

44. There is more evidence from DeLeuw's own people that gives the lie to DeLeuw's contentions—that demonstrates the pretextual nature of the stated reason for firing Makhija. Findings 45–47 review that evidence.

45. Golber did not tell anyone at DeLeuw that Makhija had been unavailable for the MDS Project until *after* the termination decision had already been made and communicated to Makhija. In fact, Golber recalls talking to Sebastian for the first time on the same day Makhija came to talk to Sebastian about his termination (May 28) (Golber Dep. 21–22). Thus when Sebastian spoke to Boyd on May 23, he had not even talked to Golber to find out the status of the Project, much less determine the effect of Makhija's absence on the Project. Had that been done, Golber would have been able to contradict Sebastian's "critical stage" assertions. In fact, Golber was surprised when he found out Sebastian had terminated Makhija (Golber Dep. 23). Nor was Golber ever consulted by Boyd, O'Connor or anyone else at DeLeuw about the details of the uncompleted work (Golber Dep. 24). Indeed, Golber's name does not surface at all in any of the initial justifications given for terminating Makhija, although it was his project that was allegedly affected by Makhija's absence.

46. Relatedly, the pretextual character of DeLeuw's asserted reason for its action in firing Makhija is evidenced by additional facts negating the existence of any "critical deadline" as of May 23, 1975 on the MSD Project:

(a) As already stated (see Finding 35), the Mechanical Engineering Department did not have any overtime authorized for the MSD Project before Makhija's vacation beginning May 23.

(b) Both Golber and Kathy Cordero, a draftsperson in the Mechanical Engineering Department who was working on the MSD Project, went on vacation in early June 1975 (Makhija Test.; Golber Dep. 25–26).

(c) DeLeuw did not submit its preliminary progress report on the MSD Project to the client until June 10, 1975 (Facts ¶ 15).

47. During the first months after Makhija was fired, Sebastian engaged in strongly pretextual statements on the subject. In his June 20, 1975 response to EEOC (JX 2), Sebastian gave three purported reasons for the firing (it will be recalled (see Finding 37) the termination notices themselves had stated only one reason—Makhija's assertedly improper vacation). Even in dealing with the subject of Makhija's vacation, Sebastian described it as Makhija's "most recent unauthorized departure" when in fact there had been no other unauthorized departures. At trial Sebastian himself admitted that statement was misleading (Sebastian Test.). Sebastian's letter to EEOC also falsely said the vacation chart was "not established procedure" for arranging and authorizing vacations. As for the other two claimed but unquestionably fabricated reasons for having fired Makhija listed in Sebastian's June 20, 1975 letter, Sebastian admitted at trial they were *false*, though he disingenuously said he didn't believe they were misleading. Similarly, Sebastian's July 7, 1975 letter to EEOC (JX 3) attempted to portray Makhija as totally unqualified for the type of work done at DeLeuw's Mechanical Engineering Department and as having serious communication difficulties, and it lied about Makhija's allegedly inadequate job performance. In like vein, Sebastian falsely listed "lack of competence" on DeLeuw's internal employee termination form (JX 4) as a reason for firing Makhija. Yet at trial DeLeuw did not even offer a scintilla of evidence to support any of those assertions, save Sebastian's unbelievable testimony.

48. In summary, DeLeuw would not have terminated Makhija but for his national origin. Not only did Sebastian know Makhija was taking two vacation days and there was no critical deadline, but he did not even bother to consult with Golber or even Makhija himself before deciding to terminate him. Makhija's good work record precludes DeLeuw's other proffered reasons from being believable—and it does DeLeuw no credit to continue to denigrate Makhija now. It must be concluded the only explanation for Sebastian's behavior is the one he himself gave to Makhija when the latter requested a raise—Makhija's national origin (which Sebastian called his lack of United States citizenship). Even had Sebastian really believed Makhija had taken off without prior permission at an inopportune time, his abrupt decision and method of termination, followed by his refusal to entertain Makhija's explanation, plainly demonstrate a total overreaction to the situation.[12] And again the reasonable inference is that such overreaction—such termination—would not have taken place but for Sebastian's bias stemming from Makhija's national origin. This Court so finds.[13]

12. Linden, O'Connor and Sebastian himself testified the procedure (or lack of procedure) followed as to Makhija was not at all a usual kind of termination. Indeed, Linden characterized the manner of termination as "unfortunate" (Linden Dep. 58–59, explaining his use of that term in PX 16).

13. One other piece of evidence provides added corroboration that the firing was not simply (a) an aberration on Sebastian's part or (b) an overreaction to the vacation episode, rather than a function of Makhija's national origin. Sebastian's April 1975 employee evaluation of Makhija (JX 1) gave him a total score of 2007 in DeLeuw's ranking system—far below Sebastian's average of 2366 for all employees he evaluated, and even farther below Watson's April 1984 scoring of Makhija (2570) (that scoring came immediately after completion of the Watson-Makhija final report on the Solar Energy Project, PX 9). Sebastian's evaluation, coming about midway between his turndown of Makhija's raise and promotion on "citizenship" grounds (a surrogate for Makhija's foreign origin) and his firing of Makhija, confirms Sebastian's continuing bias against Makhija for the same once-identified reason: his being different, an outsider, a noncitizen from a totally different kind of land. Nor does this Court find that conclusion vitiated, in light of all the evidence, by Sebastian's testimony in which he referred to his having one friend of Indian origin.

49. Though DeLeuw could have avoided this lawsuit by correcting Sebastian's action at the outset—by reversing the decision to terminate Makhija—it did not do so. Whether that was simply a matter of "closing ranks" (not wishing to undercut the authority of its supervisory personnel) or otherwise, it has clearly rendered DeLeuw liable for the discriminatory termination:

(a) On June 9 Makhija sent a letter (PX 40) to Linden at DeLeuw, explaining Makhija's progress at DeLeuw and his unfair termination by Sebastian and asking Linden to investigate.

(b) Linden conducted no investigation whatever into the circumstances (Linden Dep. 54, 55). Instead, on June 13 Linden wrote a letter to Makhija (PX 16), stating Linden had "fully review[ed] the circumstances" leading to Makhija's termination and had found the termination to be justified. That was untrue, for Linden had simply based all the representations made in his letter solely on Sebastian's and O'Connor's statements (Linden Dep. 57).

(c) Accordingly DeLeuw is responsible here, not only because Sebastian, in terminating Makhija, was a DeLeuw agent acting within the scope of his employment but also because as a matter of corporate policy DeLeuw permitted Sebastian, and employees at his level of seniority, to make final decisions as to promotions and terminations without providing any internal appeal or re-evaluation procedures for review of these decisions (Linden Dep. 25, 43, 60).

50. After Makhija's discharge, his position at DeLeuw was filled by an individual with comparable qualifications (DeLeuw's admission of Proposed Finding ¶ 57 in FPTO).

51. Almost immediately after his firing, Makhija began an extensive search for a new job as a mechanical engineer. He communicated with several potential employers and circulated his resume. Because of his responsibilities to his family, Makhija was under a great deal of financial pressure to find a new job as quickly as possible. (Makhija Test.)

52. In mid-June 1975 Makhija was interviewed by Al Cho ("Cho") of the engineering firm of Skidmore, Owings & Merrill ("Skidmore"). Makhija explained the circumstances of his termination by DeLeuw. Cho then offered Makhija a position as a grade II mechanical engineer at a monthly salary of $1,430. When Makhija said that salary level was too low, Cho told him Sebastian had not provided a good reference, but he (Cho) was willing to give Makhija a chance. Because he was in need of money, Makhija accepted the position. (Makhija Test.; JX 6)

53. Makhija did not receive a raise from Skidmore until February 1977. By that time his supervisor was Jagdish Lamba ("Lamba"), who had joined Skidmore in 1976. Lamba was very satisfied with Makhija's work performance and skills, and when he had the opportunity to review Makhija's salary he determined Makhija was earning less than comparable engineers at Skidmore. He asked Makhija about the discrepancy, and Makhija told him he had been terminated and had received unfavorable references from his prior employer. In February 1977 Makhija's salary was raised to $1,625 per month, and in March 1978 he was raised to $1,820 per month. According to Lamba, those raises were based on merit. (Lamba Dep. 10–13, 15, 16, 24; JX 6)

54. Although he felt he was entitled to a higher salary at Skidmore, Makhija did not actively press for raises because he knew his supervisors were aware of his termination by DeLeuw. Though Makhija believed that a request by him for a higher salary might well have been granted, he was afraid of the possibility that if he sought to impose pressure in that respect, Skidmore might terminate him instead. (Makhija Test.) This Court finds that concern on Makhija's part was reasonable and therefore did not derogate from his mitigation of damages.

55. Makhija resigned from Skidmore in October 1978, when he secured a higher paying position with Perkins & Will ("Per-

kins"). At Perkins he was interviewed by Roland W. Brandon ("Brandon"), chief of the Mechanical Engineering Department. Brandon was very impressed with Makhija's integrity and knowledge (Brandon Dep. 16). Makhija's termination from DeLeuw was not discussed during the interview (Makhija Test.). Because Brandon hired Makhija at "face value," his hiring decision was not directly affected by the DeLeuw termination (Brandon Dep. 20). Makhija's starting salary at Perkins was $2,330 per month (PX 66). Accordingly Makhija's damages from DeLeuw's wrongful termination ceased to accrue at that time.

*Effect of EEOC Proceedings*

56. Almost immediately after he was terminated, Makhija initiated investigations with both EEOC and FEPC. Nearly 6½ years passed before EEOC issued its right-to-sue letter to Makhija. Each party seeks to draw an improper conclusion from that fact.

57. On the one hand, DeLeuw asserts the length of time it took for the investigations to be completed has prejudiced its ability to defend itself. Nothing in the record at trial suggests the reasons for the protracted time taken by the administrative agencies, other than the established facts that (a) Sebastian misled EEOC by assigning false reasons for Makhija's termination and (b) DeLeuw appointed O'Connor as its spokesperson for the administrative investigations, although O'Connor had neither conducted any independent investigation nor possessed any first-hand knowledge about the matter. All the record contains that bears at all on the subject is found in a few exhibits:

(a') PX 77 showed FEPC was still actively processing the matter as of August 1977 (this was a DeLeuw letter saying it had already supplied a "huge volume" of material but would respond to FEPC's further requests).

(b') Several exhibits (e.g., PX 58, 60) showed EEOC was in the active investigation stage in May 1981 (its July 17, 1981 letter (PX 64) found "reasonable cause to believe that [Makhija's] charge is true").

There is no evidence of Makhija's actions having contributed in any way to the length of time before EEOC issued its determination favorable to Makhija. Nor is there any evidence of prejudice to DeLeuw's defense by reason of the delay:

(a") All but two of the DeLeuw ex-employees whose testimony was even potentially relevant were represented at trial by either live or deposition testimony.

(b") There is no reason to believe that the two persons who have died in the interim (Watson and Boyd) would have provided evidence favorable to DeLeuw [14]—and it had every opportunity and ability to provide evidence from those individuals to EEOC and to preserve any relevant evidence they might have furnished. DeLeuw cannot fault Makhija for its own failure to investigate and to preserve evidence when it knew Makhija had asserted and was pursuing his charge of discriminatory conduct.

(c") As for the one key item of documentary evidence that might have had some relevance (the vacation chart), DeLeuw's August 1977 letter said those lists were not kept after the end of the calendar year, and DeLeuw had not filed the 1975 vacation schedule for future referral (though Makhija had lodged his charges in June 1975). Thus the unavailability of that evidence is due to DeLeuw's own business practices, wholly unrelated to any delay in the investigation. Under the circumstances DeLeuw's contention of ,prejudice :caused by ;;delay must be and is rejected.

58. On the other hand, Makhija (who, though he acted pro se in the administra-

---

**14.** It will be remembered both Linden and Golber (each of them quoting Sebastian himself) confirmed the firing decision was Sebastian's, *not* Boyd's. And as for Watson, this Court has not based its decision on his having made any specific promise for a defined raise-promotion for Makhija, and there is adequate corrobora-tion for Makhija's entitlement to such favorable treatment in the absence of Sebastian's prejudice. That corroboration includes Linden's failure to deny, in June 1975, that Watson *had* discussed Makhija's promotion with Linden—though Linden's deposition testimony years later said otherwise (see n. 8).

tive proceedings, is an intelligent and articulate person) cannot fairly be permitted to place the entire delay period at DeLeuw's door. No evidence supports such a finding either. When the passage of time did not bring a resolution of the issues on Makhija's administrative charges, Makhija may reasonably be expected to have exercised his right to request a right-to-sue letter from EEOC (enabling him to bring suit earlier).

59. It is obviously impossible to be precise as to the time when Makhija (a lay person reasonably entitled to rely on the expertise of EEOC, but at the same time reasonably chargeable with the fact administrative proceedings really should not drag on for many years) should have inquired about the procedures necessary for him to proceed with his claim as a litigated matter, should have learned as a result of such inquiry that he had the right to request a right-to-sue letter from EEOC rather than waiting for the agency to complete the matter, and then should have requested his right-to-sue letter from EEOC to enable him to proceed with his claim. This Court finds it reasonable to consider (taking into account DeLeuw's conduct referred to in Finding 57) that Makhija should not have permitted the matter to have gone beyond two years at EEOC without taking such actions, so that this action should have been brought in June to September 1977 rather than February 16, 1982. But under the circumstances here that does not affect the result:

(a) Finding 57 has determined DeLeuw has shown no prejudice in evidentiary terms resulting from any delay in the institution of this action.

(b) Because Makhija ceased to suffer damages as a result of DeLeuw's discriminatory conduct in October 1978 (see Finding 55), DeLeuw also cannot complain in backpay-damage terms by reason of any delay in the institution of this action. Had Makhija requested a right-to-sue letter at the time referred to in this Finding (or indeed even at the earliest time he could have done so under the law), this action would still not have come to trial before Makhija had sustained all his damages in backpay terms.

(c) As for the effect of any delay either in the institution or prosecution of this action on the award of prejudgment interest on backpay damages, there should be none. Throughout the entire period involved, Makhija has sustained the loss of use of the money involved, while DeLeuw has had the benefit of the use of that money. Accordingly it is proper to award prejudgment interest for the entire period, irrespective of the cause (or any considerations of "fault") to which any delays were attributable. Hence the methodology followed for calculating Makhija's damages, as reflected in the Appendix, is the correct one.

*Makhija's Damages*

■ 60. Based solely upon his education, experience, capabilities and job performance, and but for DeLeuw's discrimination of Makhija because of his national origin, Makhija should have been classified and compensated as a Grade IV or Grade V engineer at the latest by June 1975. For the reasons stated in earlier Findings, Makhija was entitled to receive a salary of at least $1,600 per month as of June 1, 1975. Based upon DeLeuw's usual and customary compensation practice and the comparable practices of other engineering firms, Makhija would have been entitled to normal and regular increases and promotions thereafter.

61. In addition to the factors identified in prior Findings, Makhija's claim that he was underpaid by DeLeuw in the spring of 1975 is supported also by Brandon's expert testimony. After reviewing comparable salary histories from DeLeuw's Mechanical Engineering Department and Makhija's qualifications and performance including his work for Brandon himself, as well as his work on the Solar Energy Project, Brandon testified Makhija was underpaid and should have been classified as Grade IV or V and paid approximately $20,000 per year (Brandon Dep. 35, 38). DeLeuw offered no evidence to counter that testimony other than by way of attempted invidious comparisons between Makhija and others

of its engineers. This Court has found those comparisons, to the extent they are valid, would still call for a June 1975 salary of $1,600 monthly ($19,200 annually) for Makhija, rather than $1,700 monthly ($20,400 annually).

62. Obviously, an employee's prior termination affects a later hiring decision by a prospective new employer and generally reduces the amount of money an applicant can ask for (and can get) when he is being hired. Indeed, the effects of a prior termination continue past the hiring point because, even if the employee's performance is excellent, the later employer is going to take into account its initial hiring decision when making a promotion or salary increase decision (that is, a depressed initial level of compensation or ranking naturally tends to perpetuate itself). Moreover, the employer may remain suspicious of the qualities of an employee previously fired for on-the-job misconduct (Lamba Dep. 16; Brandon Dep. 18–19). DeLeuw's witness O'Connor (despite his attempts to argue that a firing has no subsequent effect) admitted there would be adverse effects if an engineer was terminated for failure to complete work, the reason DeLeuw originally gave for Makhija's termination (O'Connor Test.).

63. Although Makhija was able to find a new position within 12 days at a salary actually $55 a month higher than his salary at DeLeuw, Makhija's damages cannot be limited to his lost earnings during those 12 days. DeLeuw cannot seek to benefit from the fact that despite the effects of a termination and a bad reference, Makhija's qualifications were quickly able to muster a salary with a new employer that was a few dollars higher than DeLeuw had been paying him. Indeed, that fact really cuts against DeLeuw: It supports the finding that Sebastian's refusal to consider and approve a promotion and raise for Makhija—a discriminatory decision—caused Makhija to be substantially undercompensated in June 1975.

64. As a direct result of DeLeuw's discrimination against Makhija on the basis of his national origin, Makhija has lost earnings in the amount of $33,834.64 (taking the appropriate interest factors into account). That figure has been calculated in accordance with the Appendix to these Findings.

65. Makhija is entitled also to an award of costs and expenses, including reasonable attorneys' fees for prosecuting this action. Makhija's attorneys are therefore given 35 days (until August 24, 1987) in which to file a petition setting forth the amount claimed. Counsel for Makhija and for DeLeuw are urged to confer in the interim to determine the extent to which the need for an evidentiary hearing may be obviated as to one or more of the relevant issues: number of hours spent, hourly rates and the appropriateness of hours-times-rates as a measure of reasonable fees.

### Conclusions of Law

1. This Court has jurisdiction over Makhija's claim of discriminatory treatment because Makhija has fulfilled the jurisdictional requirements prescribed in Section 2000e–5(f)(3). That jurisdiction extends to Makhija's claim of discriminatory termination, but not to his belated claim of DeLeuw's earlier failure to promote him or raise his pay (see this Court's oral bench ruling of August 13, 1985, denying leave to amend the Complaint to add that claim).

2. Makhija presented, by a preponderance of the evidence, a prima facie case of discriminatory treatment because of national origin in violation of Section 2000e–2(a) by showing that:

(a) Makhija, an individual of Indian origin, was qualified for his position as a mechanical engineer.

(b) Makhija's performance was evaluated by DeLeuw's agents as satisfactory until Sebastian became Makhija's supervisor.

(c) Despite his satisfactory performance, DeLeuw discharged Makhija May 23, 1975.

(d) DeLeuw later filled Makhija's position with an individual of comparable qualifications.

*Kirk v. Board of Education*, 811 F.2d 347, 354 n. 10 (7th Cir.1987).

3. Once Makhija proved a prima facie case, the burden shifted to DeLeuw to produce evidence of a "legitimate nondiscriminatory reason" for its actions (though the burden of proof, as contrasted with the burden of production, remained with Makhija). *Yowell v. United States Postal Service*, 810 F.2d 644, 647 (7th Cir.1987).

4. DeLeuw satisfied the burden of articulating a potentially legitimate nondiscriminatory reason for terminating Makhija: his allegedly unauthorized taking of two days of vacation time at a critical period. Once that was done, Makhija's burden of proof became a burden of establishing that reason was pretextual. *Yowell*, 810 F.2d at 647. And that burden was satisfied by Makhija's having proved Sebastian (and therefore DeLeuw, under the circumstances of this case) discriminated against Makhija because of his national origin: that is, that Sebastian (and therefore DeLeuw) would not have terminated Makhija for the assigned reason but for his national origin (*Maguire v. Marquette University*, 814 F.2d 1213, 1216–17 (7th Cir.1987)), so that the assigned reason was pretextual by definition.

5. It is legally irrelevant that Sebastian disclosed his bias against Makhija by stating he would *not* promote Makhija because he was not a United States citizen (rather than speaking specifically of Makhija's national origin). That stated reason was a euphemism for the Title VII-prohibited bias and violates the statute in any event, for an irrelevant citizenship criterion is an obvious way to camouflage discrimination because of national origin. See *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 92, 94 S.Ct. 334, 338, 38 L.Ed.2d 287 (1973); 29 C.F.R. § 1606.1(d).

6. Makhija has thus satisfied his burden of proving he was discriminated against in violation of Section 2000e–2 and under the standards set forth by the United States Supreme Court. *Yowell*, 810 F.2d at 647 and cases cited.

7. DeLeuw did not sustain its burden of proving the extraordinarily long period of time between Makhija's EEOC filing and the issuance of EEOC's right-to-sue letter amounted to inexcusable delay on Makhija's part:

(a) Unlike *Jeffries v. Chicago Transit Authority*, 770 F.2d 676, 680 (7th Cir. 1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986), this is not a case in which Makhija alone "was the party with any pertinent evidence" (*id.*). DeLeuw was equally able to adduce proof on the circumstances of the delay, and *it* had the burden of proof on the issue (*id.*).

(b) DeLeuw offered nothing at all on the subject, apparently choosing instead to rely on the inference of unreasonableness stemming from delay alone (*id.*). Even in that respect, the sole evidence presented to this Court demonstrates DeLeuw acted to frustrate EEOC's investigation by giving false reasons for Makhija's termination (Sebastian's two letters) and by assigning an uninformed person (O'Connor) to handle the matter with the agency. Once evidence of that nature was introduced, DeLeuw had the obligation to respond with some showing rather than relying on a naked inference of unreasonableness.

But even if that were not so, DeLeuw has not sustained its burden of establishing material prejudice (*id.* at 680–81)—see Finding 57. Accordingly DeLeuw's laches defense fails.

8. Under Title VII courts have full equitable powers to make individuals whole for injuries suffered on account of unlawful discrimination. See Section 2000e–5(g); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Here an award of backpay is the appropriate relief because it compensates Makhija and also provides incentive to an employer such as DeLeuw to obey the statute. See *Stewart v. General Motors*, 542 F.2d 445, 451 (7th Cir.1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977).

9. Back pay is determined by measuring the difference between Makhija's actual earnings for the relevant period and

those he earned or could have earned absent the discrimination by DeLeuw. *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1321 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), followed in such cases as *Taylor v. Phillips Industries, Inc.*, 593 F.2d 783, 786–87 (7th Cir.1979). Those calculations are reflected in Appendix A.

10. To make Makhija whole, Makhija's backpay award should include prejudgment interest calculated annually at the "adjusted prime rate." As this Court's colleague Judge Susan Getzendanner has done in her unpublished opinion in *EEOC v. Cook County Department of Corrections*, No. 84 C 10886, slip op. at 4–5 (N.D.Ill. Jan. 29, 1987) [Available on WESTLAW, DCT database], this Court will follow *EEOC v. County of Erie*, 751 F.2d 79, 82 (2d Cir. 1984) in that respect. De Leuw urges interest should not be awarded, citing *Kamberos v. G.T.E. Automatic Electric, Inc.*, 603 F.2d 598, 603 (7th Cir.1979) and this Court's opinion in *Killingham v. Board of Governors*, 549 F.Supp. 225, 227 (N.D.Ill.1982). But those cases teach *backpay damages* should be calculated by eliminating the excess time period caused by a plaintiff's inaction. Finding 59 has demonstrated Makhija is *not* recovering any more backpay that he would have if such time period were eliminated, and it also shows why Makhija's *interest* award (a subject not addressed in *Kamberos* or *Killingham*) should *not* be reduced for any claimed delay period.

11. Makhija is also entitled to an award of costs and expenses, including attorneys' fees, for litigating his claim. *LeBeau v. Libbey-Owens-Ford Co.*, 799 F.2d 1152, 1156 (7th Cir.1986).

\* \* \*

It is ordered and adjudged that Joginder Kumar Makhija recover of DeLeuw, Cather and Company the sum of $33,834.64 with interest thereon as provided by law after the date of this judgment, and his costs of action (including expenses and reasonable attorneys' fees in accordance with the applicable statute).

### Appendix

Because this Court has found the $1,700 per month level of compensation proposed by Makhija too high by $100, it becomes necessary to recalculate Makhija's damages. This Appendix will outline the methodology used and the end result obtained.

First, Makhija's arms-length October 1978 hiring by Perkins & Will—a hiring admittedly unaffected by his DeLeuw termination—reflects the fair market value of his services at November 1, 1978 (this calculation has used the first day of the month after the Perkins & Will hiring for convenience, thus avoiding a fractional number of months in the relevant time period). On the reasonable assumption of annual increases, the question becomes what annual rate of increase would cause Makhija to progress from $1,600 at June 1, 1975 (when he should have had his increase at DeLeuw in the absence of his discriminatory firing) to $2,330 monthly at November 1, 1978. 41 months later. That rate discounts out to 11.62883% annually.

Application of that growth rate for each of the years involved, until the Perkins & Will hiring cut off Makhija's damages, produces these figures:

| Dates | Monthly | Annually |
|---|---|---|
| 6/1/75 – 5/31/76 | $1,600 | $19,200 |
| 6/1/76 – 5/31/77 | 1,786.06 | 21,432.74 |
| 6/1/77 – 5/31/78 | 1,993.76 | 23,925.11 |
| 6/1/78 – 10/31/78 | 2,225.61 | 26,707.32 |

In turn, those annual salaries—measuring the amount Makhija would reasonably have earned but for DeLeuw's unlawful discrimination—serve as the predicate for calculating Makhija's damages.

First, Makhija's 12 working days of unemployment from the May 23, 1975 termination date at DeLeuw until the June 11 hiring date at Skidmore amounted to a loss of $886.20. That calculation is based on the same 260 working days per year assumption that was followed in PX 33 and not really challenged by DeLeuw (DeLeuw seeks to bind Makhija by a stipulation to a

lower amount for that 12–day period, but that stipulation cannot be viewed as binding where this Court has rejected its underlying predicate).

Second, the projected earnings at the fair market value figures listed above (that is, what Makhija would have earned were it not for DeLeuw's discrimination), less his actual earnings, together with prejudgment interest at the NLRB and IRS rate (see PX 33 n. 3) through October 31, 1978, are shown in Table 1. Again DeLeuw has not attacked the methodology in PX 33 (though it disputes the premises), and this Court approves that methodology and has made the calculations the same way.

Third, the resulting total at October 31, 1978, carried forward to July 15, 1987 at the applicable interest rates, is shown in Table 2. Rates since the PX 33 final date are from the same source as used for the earlier period.[1]

## Table 1

| Time Period | Earnings Absent Discrimination | Actual Earnings | Difference | Interest | Total |
|---|---|---|---|---|---|
| 5/23/75– 6/10/75 | 886.20 | — | 886.20 | — | 886.20 |
| 6/11/75– 5/31/76 | 18,683.08 | 16,698 | 1,985.08 | 60.34 | 2,931.62 |
| 6/1/76– 5/31/77 | 21,432.74 | 17,837.95 | 3,594.79 | 205.21 | 6,731.62 |
| 6/1/77– 5/31/78 | 23,925.11 | 20,085 | 3,840.11 | 443.16 | 11,014.89 |
| 6/1/78– 10/31/78 | 11,128.05 | 9,485.50 | 1,642.55 | 275.37 | 12,932.81 |

## Table 2

| Time Period | Interest | Total |
|---|---|---|
| 11/1/78 – 5/31/79 | 452.65 | 13,385.46 |
| 6/1/79 – 5/31/80 | 1,137.76 | 14,523.22 |
| 6/1/80 – 5/31/81 | 1,742.79 | 16,266.01 |
| 6/1/81 – 5/31/82 | 2,494.02 | 18,760.13 |
| 6/1/82 – 5/31/83 | 3,439.36 | 22,199.49 |
| 6/1/83 – 5/31/84 | 2,534.44 | 24,733.93 |
| 6/1/84 – 5/31/85 | 2,926.85 | 27,660.78 |
| 6/1/85 – 5/31/86 | 2,973.53 | 30,634.31 |
| 6/1/86 – 5/31/87 | 2,782.62 | 33,416.93 |
| 6/1/87 – 7/20/87 | 417.71 | 33,834.64 |

1. This Court has obtained, and takes judicial notice of, the information contained in IRS Mem. GC 86–12 (Dec. 24, 1986), specifying "the interest rates to be applied to backpay and other monetary remedies accruing" all the way to the current time.